The **DOMED STADIUM HOTEL, INC.,**
d/b/a **Holiday Inn-Superdome,**
**Plaintiff-Appellant,**

v.

**HOLIDAY INNS, INC.,**
**Defendant-Appellee.**

No. 83–3074.

United States Court of Appeals,
Fifth Circuit.

May 21, 1984.

---

Leach, Paysee & Baldwin, Ford J. Dieth, New Orleans, La., for plaintiff-appellant.

Sessions, Fishman, Rosenson, Snellings & Boisfontaine, Curtis R. Boisfontaine, Robert E. Barkley, Jr., Sally Shushon, New Orleans, La., for defendant-appellee.

Before POLITZ, RANDALL and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Domed Stadium Hotel, Inc. (Superdome Hotel), a Louisiana corporation, brought this action against Holiday Inns, Inc., a Tennessee corporation, alleging that Holiday Inns' acquisition of the Chateau LeMoyne Hotel in downtown New Orleans breached its franchise agreement with Holiday Inns and also violated sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2, and section seven of the Clayton Act, 15 U.S.C. § 18. After lengthy discovery the district court orally granted Holiday Inns' motion for summary judgment on both the antitrust claims and the contract claims. We agree with the district court that the contract claims, Clayton Act claims and section one Sherman Act claims are without merit. We also hold that as a matter of law, the relevant product market is hotel rooms generally, and not the submarket of Holiday Inn hotel rooms. We agree with the district court that Holiday Inns does not have legally sufficient market power

within the hotel room product market so that its actions violate section two of the Sherman Act or Section seven of the Clayton Act. We therefore affirm the decision of the district court.

## I.

In December of 1974, after more than a year of negotiating, Joseph M. Rault, Jr., President of The Domed Stadium Hotel, Inc., entered into a management agreement with Holiday Inns providing for Holiday Inns to manage the seventeen-story building he owned in downtown New Orleans as a Holiday Inn hotel. Dissatisfied with this arrangement, in 1976 the parties altered their relationship, and the Superdome Hotel became a franchised member of the Holiday Inn chain. The franchise agreement between the parties granted the Superdome Hotel the right to operate a Holiday Inn hotel at a specific site in downtown New Orleans, and explicitly reserved to Holiday Inns the right to construct and operate other Holiday Inn hotels "at any place other than on the site licensed." [1] As a franchised Holiday Inn hotel, the Superdome Hotel enjoyed all the benefits of Holiday Inns' nationwide advertising and marketing programs, and also obtained business through Holiday Inns' toll-free nationwide computerized reservations service known as "Holidex."

Prior to 1974 when the Superdome Hotel first began operating as a Holiday Inn, Holiday Inns owned and operated the Holiday Inn-French Quarter, the only Holiday Inn hotel in downtown New Orleans. The approximately 250-room Holiday Inn-French Quarter enjoyed a high rate of occupancy and often could not accommodate all the patrons who, through Holidex, attempted to reserve hotel rooms in downtown New Orleans. After the Superdome Hotel became part of the Holiday Inns chain, Holiday Inns referred Holidex patrons to the Superdome Hotel. Some of these Holidex referrals were patrons whom the Holiday Inn-French Quarter could not accommodate.

In 1978 Holiday Inns entered into an agreement to acquire the Chateau LeMoyne, a 172-room hotel located in the French Quarter area of New Orleans, between the Holiday Inn-French Quarter and the Superdome Hotel. Prior to acquiring the Chateau LeMoyne, Holiday Inns asked a private market research firm to conduct a routine market analysis to determine the impact of Holiday Inns' acquisition of the Chateau LeMoyne on other Holiday Inn hotels in the area. The study concluded that, because the Chateau LeMoyne added 172 rooms "to the market serviced by the Holidex reservation system," the Superdome Hotel would lose twelve to fifteen percent of its occupancy during the three-month tourist season, or three to five percent over a year. The study concluded, however, that if tourism continued to grow in New Orleans, the Superdome Hotel's losses would be temporary and could be minimized further by aggressive marketing. In 1979 Holiday Inns incorporated the Chateau LeMoyne into its system as a company-owned hotel. The rooms in the two company-owned Holiday Inn hotels—the Chateau LeMoyne and the Holiday Inn-

---

**1.** The agreement, in part, provided:
IT IS MUTUALLY COVENANTED AND AGREED AS FOLLOWS:
First: Licensor hereby grants to licensee, subject to the terms and conditions hereof, a non-assignable, *non-exclusive license* to use said system in the operation of one Holiday Inn on the following described *specific site:*
Existing 173 room (keys) Inn located at 1111 Gravier Street, New Orleans, Louisiana, 70112 known now and to continue to be operated as "Holiday Inn-Superdome".
. . . .
It is further understood and agreed that the Licensor has, and shall continue to have dur-

ing the life of this license agreement . . . the right to construct and operate one or more Holiday Inns at any place other than on the site licensed hereby.
. . . .
Second: Licensee does acknowledge and recognize . . . [t]hat this license is *not exclusive;* that licensor is enabled in accordance with the provisions hereof, to construct and operate, or permit to be constructed and operated by other license applicants, additional Holiday Inns anywhere except at the site licensed hereby . . . (emphasis added).

French Quarter—gave Holiday Inns, at most, approximately four percent of the total number of hotel rooms in downtown New Orleans.[2]

In December of 1978 the Superdome Hotel filed this lawsuit against Holiday Inns. It alleged that by operating the Chateau LeMoyne as a company-owned Holiday Inn hotel, Holiday Inns competed against the Superdome Hotel in violation of the 1976 franchise agreement. The Superdome Hotel also alleged that Holiday Inns attempted to monopolize the Holiday Inn room market in downtown New Orleans by acquiring the Chateau LeMoyne and thereby violated the Sherman and Clayton antitrust acts. Finally, the Superdome Hotel alleged that by referring Holidex patrons to the company-owned Chateau LeMoyne rather than the franchised Superdome Hotel, Holiday Inns acted anticompetitively in violation of the Sherman Act.

In 1980 Holiday Inns terminated the franchise agreement. The Superdome Hotel attempted to obtain a preliminary injunction in federal district court to prevent the termination, but, after more than three weeks of hearings, the district court denied the preliminary injunction, and this court affirmed that decision. *Domed Stadium Hotel v. Holiday Inns, Inc.*, 644 F.2d 32 (5th Cir.1982). Holiday Inns subsequently filed a motion for partial summary judgment, seeking dismissal of the Superdome Hotel's antitrust claims. On May 12, 1982, the district court granted this motion. Holiday Inns then brought a motion for summary judgment seeking dismissal of the Superdome Hotel's remaining claims, all of which were contract claims. On December 27, 1982, the district court granted this motion, thus disposing of the entire case. The Superdome Hotel filed a timely notice of appeal pursuant to 28 U.S.C. § 1291.

## II.

The Superdome Hotel argues that by acquiring the Chateau LeMoyne, Holiday Inns violated the express terms of their franchise agreement, breached the implied obligation of good faith that exists in every contractual relationship, and breached the fiduciary relationship existing between the parties. The district court correctly held that these claims are unmeritorious.

■ Under Louisiana law, which governs this franchise agreement, we must enforce the contract to ratify the intent of the parties. *Acree v. Shell Oil Co.*, 548 F.Supp. 1150, 1153 (M.D.La.1982); *Smith v. Moncrief*, 421 So.2d 1127, 1131 (La.Ct. App.1982). We must ascertain intent by referring to the words of the contract, as long as the words are clear, explicit, and lead to no absurd consequences. *Maloney v. Oak Builders, Inc.*, 256 La. 85, 235 So.2d 386 (1970). The words also must be interpreted consistently with their common and usual significance, and any doubt or ambiguity in their meaning must be resolved by referring to other words or phrases in the contract and to the contract as a whole. *Lambert v. Maryland Casualty Company*, 418 So.2d 553 (La.1982).

■ The franchise agreement grants the Superdome Hotel the right to operate a Holiday Inn hotel at a specific site. It specifically states that the license is not exclusive, and that Holiday Inns may "construct and operate one or more Holiday Inns at any place other than on the site licensed."[3] Nothing could be clearer than the fact that Holiday Inns did not grant the Superdome Hotel a territorial license, and that consequently, Holiday Inns did not breach the express terms of the franchise agreement by acquiring the Chateau LeMoyne Hotel.

The Superdome Hotel argues that by using the terms "construct and operate," the

---

**2.** The record is not clear on exactly how many rooms the two company-owned Holiday Inn hotels together contained, but evidently the total is between 345 and 426. The record also is unclear about how many hotel rooms exist in downtown New Orleans, but evidently the total

is between 10,000 and 11,605. Consequently, Holiday Inns owned between 2.97% and 4.26% of the hotel rooms in downtown New Orleans.

**3.** *See supra* note 1.

franchise agreement reserved to Holiday Inns only the right to build new hotels and operate them as Holiday Inns hotels. By negative implication, the agreement does not allow Holiday Inns to purchase ongoing enterprises and convert them to Holiday Inn hotels. This creative interpretation of the words "construct and operate" is unsound under Louisiana's general principles of contract construction. Not only is it contrary to the common and usual significance of the words "construct and operate," but it also is inconsistent with other provisions of the agreement that specify the non-exclusivity of the Superdome Hotel's rights, and limit its right to a specific site in downtown New Orleans.

■ The Superdome Hotel's argument that Holiday Inns breached the implied general obligation of good faith that permeates every contractual relationship must fall with our holding that the terms of the franchise agreement do not grant the Superdome Hotel a territorial license. The implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them. *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 138 (5th Cir.1979) (interpreting Uniform Commercial Code article I).

■ Finally, Holiday Inns did not breach any fiduciary obligation toward the Superdome Hotel by acquiring the Chateau LeMoyne and converting it into a Holiday Inn hotel. Except in cases of franchise termination, in which courts have refused to give literal effect to the language of the franchise agreement, courts have not imposed general fiduciary obligations upon franchisors. *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 355 (7th Cir.1982); *Newark Motor Inn Corp. v. Holiday Inns, Inc.*, 472 F.Supp. 1143, 1151–52 (D.N.J. 1979). *Cf. Carter Equipment Co. v. John Deere Industrial Equipment Co.*, 681 F.2d 386, 390–91 (5th Cir.1982) (whether fran-

chise relationship is fiduciary is a question of fact). We also refuse to do so.[4]

The Superdome Hotel relies upon *Arnott v. American Oil Company*, 609 F.2d 873 (8th Cir.1979) to support its argument that Holiday Inns had a fiduciary obligation toward the Superdome Hotel. This reliance is misplaced. The dispute in *Arnott* arose from an alleged wrongful franchise termination, rather than from harm alleged to have occurred during an ongoing franchise relationship. Although the court in *Arnott* said that a fiduciary duty inheres in a franchise relationship, a close examination of the court's analysis and of the challenged jury instructions it upheld reveals that it applied no more than basic contract principles to hold that the defendant breached a duty of good faith and fair dealing. *Id.* at 880–84. *See also Murphy*, 691 F.2d at 355.

Nothing in this case suggests that the Superdome Hotel and Holiday Inns' relationship was anything other than that of two business entities dealing at arms' length. In fact, Rault, owner of the Superdome Hotel, himself solicited Holiday Inns' support when he first opened the Superdome Hotel. In 1976, when the original management agreement proved unsatisfactory to him, he successfully convinced Holiday Inns to alter its relationship with the Superdome Hotel, and make the hotel a franchised Holiday Inn hotel operated by its own personnel.

Having examined the Superdome Hotel's contract arguments, and having found them to be without merit, we now turn to the antitrust issues presented by this case.

### III.

The Superdome Hotel asserted violations of sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2, and section seven of the Clayton Act, 15 U.S.C. § 18. The district court granted the defendant's motion for summary judgment on all of these claims.

---

**4.** The Superdome Hotel did not allege that Holiday Inns breached its fiduciary relationship

when it terminated the franchise.

■ The Superdome Hotel contends that summary judgments are inappropriate in complex, fact-sensitive antitrust cases. We agree that district courts should grant summary judgments sparingly in antitrust cases. *Transource International, Inc. v. Trinity Industries, Inc.*, 725 F.2d 274 (5th Cir.1984). Some antitrust cases, however, are approximately dismissed on motion for summary judgment because, despite their complexity, no dispute exists regarding an underlying material fact. *Bayou Bottling, Inc. v. Dr. Pepper Company*, 725 F.2d 300 (5th Cir.1984); *Southway Theaters, Inc. v. Georgia Theatre Co.*, 672 F.2d 485 (5th Cir.1982); *Carlson Machine Tools, Inc. v. American Tool, Inc.*, 678 F.2d 1253 (5th Cir.1982). In *Aladdin Oil v. Texaco, Inc.*, 603 F.2d 1107, 1111 (5th Cir.1979), the court observed that

> simply because a case is based upon the antitrust laws does not suspend the application of Rule 56. The reason summary judgments may seem less common in antitrust cases is because such cases are ripe with issues of motive, intent and credibility which often must be inferred from the total circumstances.

*See also First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

This case is one appropriately dismissed on motion for summary judgment because no dispute exists regarding the material facts dispositive of the legal issues involved.

### A.

■ Section one of the Sherman Act forbids "[e]very contract, combination ..., or conspiracy, in restraint of trade...." 15 U.S.C. § 1. This section requires the plaintiff to prove that separate business entities acted in concert. Conduct by a single firm cannot violate section one. *E.g., Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 286–88 (5th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). The Superdome Hotel does not allege, and nothing in the record suggests, that Holiday Inns and the Chateau LeMoyne conspired or combined to restrain trade prior to the Chateau LeMoyne's becoming a Holiday Inn hotel. The Superdome Hotel also does not allege that Holiday Inns and the Chateau LeMoyne remained separate after the acquisition. Thus, the two, as part of the same economic enterprise, are incapable as a matter of law of conspiring to violate section one. Additionally, because we conclude in Section III C of this opinion that the acquisition of the Chateau LeMoyne did not violate section seven of the Clayton Act, a fortiori, no combination occurred in violation of section one of the Sherman Act.

■ Although a corporation and its franchisees may combine or conspire to restrain trade, *e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), a point well established in this circuit is that a corporation cannot conspire or combine with its own officers, employees,[5] or wholly owned sales divisions and outlets in violation of section one. *H & B Equipment Company, Inc. v. International Harvester Company*, 577 F.2d 239, 244 (5th Cir.1978) (citing cases). *See also Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 205–06 (5th Cir.1969). The Chateau LeMoyne is not a franchised Holiday Inn; for purposes of section one liability, it is wholly owned by Holiday Inns, and indistinguishable from Holiday Inns itself.[6] Thus, the Superdome Hotel's

---

**5.** The one arguable exception to the general rule that a corporation cannot conspire with its own employees in violation of section 1 occurs in the rare instances in which employees have an independent personal stake in achieving the object of the conspiracy. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 470, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962). The Superdome Hotel has not alleged, nor do the facts uncovered in discovery suggest, that the exception might apply in this case.

**6.** Thus, we need not determine when a wholly owned but separately incorporated subsidiary is an entity capable of conspiring with its parent. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 726–27 (7th Cir.1979) *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). The Supreme Court recently heard oral argument in

section one claim is without merit; indeed, the Superdome Hotel itself failed to support it with any basis in fact. The district court properly granted Holiday Inns' motion for summary judgment.

### B.

■ Section two of the Sherman Act forbids "[e]very person [to] monopolize, or attempt to monopolize any part of the trade or commerce ...." 15 U.S.C. § 2. Monopoly power is "the power to control price or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). To prove a completed monopolization offense, a plaintiff must prove the defendant had both the capacity and the intent to monopolize. As stated by the Supreme Court in *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), the "offense of monopoly under § 2 ... has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

■ Before the fact-finder can evaluate the defendant's market power, however, it must define the relevant market. *E.g., Dimmitt Agri Industries, Inc. v. CPC International, Inc.*, 679 F.2d 516, 521 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). The relevant market has both geographic dimensions and product dimensions. *Fort Worth National Corp. v. Federal Savings and Loan Insurance Corp.*, 469 F.2d 47, 59 (5th Cir.1972); *Hornsby Oil Company, Inc. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir.1983). In this case, the Superdome Hotel alleged the relevant geographic market to be downtown New Orleans, including the French Quarter, central business district, and area surrounding the New Orleans Superdome stadium. The district court adopted this definition for purposes of issuing its summary judgment, and Holiday Inns does not seriously contest the district court's holding on this point. Consequently, for purposes of this appeal, we also consider this area, covering all of downtown New Orleans, to be the relevant geographic market.

■ The district court defined the relevant product market as hotel rooms. The Supreme Court, in the *du Pont* case, articulated the classic test for defining the relevant product market when it said "commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade of commerce,' monopolization of which may be illegal." *E.I. du Pont de Nemours & Co.*, 351 U.S. at 395, 76 S.Ct. at 1007, 100 L.Ed. at 1280. While Holiday Inns argues that the district court's definition obviously is correct, the Superdome Hotel correctly argues that product market definition generally presents a question of fact to which it is entitled to jury resolution. *See Dimmitt Agri Industries,* 679 F.2d at 525. Indeed, antitrust law recognizes that economically significant submarkets may exist which themselves constitute relevant product markets. *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510; *Hornsby Oil Company, Inc. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir.1983); *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The fact finder may determine a submarket exists by "examining such practical indicia as industry or public recognition of the sub-market as a separate economic entity, the product's peculiar charac-

the case of *Copperweld Corp. v. Independence Tube Corp.,* (No. 82–1260; argued Dec. 5, 1983), involving the intra-enterprise conspiracy issue of whether a corporation can conspire with its wholly owned, separately incorporated subsidiary in violation of section one. We base our decision in this case on the uncontested fact that Holiday Inns and the Chateau LeMoyne are parts of a single entity. Thus, our opinion should not be affected by the Supreme Court's holding in the *Copperweld* case.

teristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524, 8 L.Ed.2d at 535–36.

According to the Superdome Hotel, a jury might conclude that the relevant market in this case is the submarket of Holiday Inn rooms, and not hotel rooms generally. The Superdome Hotel attempts to differentiate Holiday Inn hotel rooms from other hotel rooms on the basis that Holiday Inns provides a unique, nationwide, toll-free computerized reservation service known as "Holidex." In fact, Holiday Inns' own market impact analysis supports the Superdome Hotel's argument by referring to "the market serviced by the Holidex reservations system." [7]

The Superdome Hotel argues that the relevant market from which to analyze its claims is comprised only of Holiday Inn hotel rooms and that Holiday Inns has control over one hundred percent of this market. Its argument, however, is without merit as a matter of law, because absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market.

In recognizing that a manufacturer's monopoly over the distribution of its own products is not illegal, the Supreme Court stated that:

one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trade-marked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*E.I. du Pont de Nemours & Co.*, 351 U.S. at 393, 76 S.Ct. at 1006, 100 L.Ed. at 1279. Subsequent cases in this circuit express the same principle. In *Spectrofuge Corporation v. Beckman Instruments, Inc.*, 575 F.2d 256 (5th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), we observed that "[t]he fact that a company limits its competitive activity to a single firm's products (and at only one competitive level) cannot control the definition of the relevant market." *Id.* at 282. *See also Transource International, Inc. v. Trinity Industries, Inc.*, 725 F.2d 274 (5th Cir.1984); *Parsons v. Ford Motor Co.*, 669 F.2d 308 (5th Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982); *Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786, 791 (5th Cir.1982). For purposes of our analysis here, no material distinction exists between Holiday Inns, which "produces" hotel rooms, and manufacturers of commodities who market their products nationally under trademarked brand names. [8]

The Superdome Hotel argues that an exception to the general rule prohibiting sin-

---

**7.** Holiday Inns rebuts the Superdome Hotel's argument by noting that Holiday Inns competes with several other hotel chains in New Orleans that offer Holidex-type services. These hotels include Hilton, Marriott, Ramada Inn, LaQuinta, Rodeway Inn, Travel Lodge, Best Western and Howard Johnson. This rebuttal argument suggests that a relevant submarket may exist comprised of rooms served by computerized, nationwide, toll-free reservations services. The Superdome Hotel, however, did not pursue this issue in district court, in its brief filed with this court, or at oral argument. Consequently, we do not address it. *See First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

**8.** The Superdome Hotel relies on the case of *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 979–81 (5th Cir.1977), *cert. denied*, 434

U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978) for the proposition that it is entitled to have a jury decide if the relevant market is Holiday Inn hotel rooms. Its reliance on this case is misplaced. In the section two and section seven violations alleged in the *Heatransfer* case, the single-brand market involved was not the product marketed by the plaintiff, i.e., air conditioners, but the single brand or brands of products marketed by the plaintiff's customers, i.e., Volkswagen, Porsche, and Audi automobiles. *Id.* at 971. Such a situation in which one large customer-manufacturer creates a market is materially and analytically different from the present case in which one large seller allows different types of outlets to sell its products in a market in which many brands compete for customers.

gle-market definitions applies to this case. We do not agree. The exception applies when the manufacturer of a unique product uses his control over one market, or level of competition, to eliminate competition at another level, or submarket.[9] *See Eastman Kodak v. Southern Photo Materials Company,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Transource International, Inc.,* 725 F.2d at 283 n. 9; *Spectrofuge,* 575 F.2d at 282. The Superdome Hotel urges that a jury could conclude that Holiday Inns might have exercised monopolistic power over Holiday Inn hotel rooms by its leverage in the use of Holidex services. Even assuming that Holiday Inn rooms are the relevant market that Holidex reservations are a service representing a separate market over which Holiday Inns has control, rather than a marketing tool inseparable from Holiday Inn hotel rooms generally, the argument fails for lack of factual support. The evidence in the record clearly shows that in 1978 the Superdome Hotel received more than twice the number of reservations, and twice the revenue, from Holidex than did the Holiday Inn-French Quarter. In 1979 the Superdome Hotel received 13,000 "room nights" of reservations through Holidex, representing $586,019.00 in revenue, while the Holiday Inn-French Quarter received 8,975 room nights representing $501,898.00 in revenue, and the Chateau LeMoyne received 6,248 room nights representing $353,383.00 in revenue.[10] Thus, no material issue of fact exists; Holiday Inns did not use its control over Holidex reservations to the Superdome Hotel's detriment in violation of section two of the Sherman Act.

Hotel rooms, then, and not Holiday Inn hotel rooms, must be the relevant market. The offense of monopolization requires that the defendant dominate the relevant market. Market domination may result solely from control of a large share of the market, or from control of some significant part of a market containing characteristics that allow it to be controlled by a participant not having a grossly disproportionate share of it. *See United States v. Columbia Steel Co.,* 334 U.S. 495, 527–28, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948). The precise market share a defendant must control, absent supporting evidence of monopoly power before he is guilty of monopolization, remains undefined. In *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir.1945), *approved and adopted, American Tobacco Co. v. United States,* 328 U.S. 781, 811–14, 66 S.Ct. 1125, 1139–41, 90 L.Ed. 1575 (1946), Judge Learned Hand created the widely accepted rule of thumb that while a 90 percent market share definitely is enough to constitute monopolization, "it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not." 148 F.2d at 424. Supreme Court cases, as well as cases from this court, suggest that absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization.[11]

---

**9.** Courts also have recognized an exception when one firm's product has total market dominance, as opposed to a monopoly over its own brand, so that any action to increase control over the market is inherently anticompetitive. *See Spectrofuge,* 575 F.2d at 282 (more detailed explanation; citations included).

**10.** Actual revenue may have been lower due to cancellations of reservations not reflected in these figures.

**11.** Illustrative Supreme Court cases include *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (91% market share); *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (87%); *International Boxing Club of New York, Inc. v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 370 (1959) (81%); *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911) (86%); *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) (90%); *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295 (D.Mass. 1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954) (75%); *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (70%); *United States v. Pullman Co.,* 50 F.Supp. 123 (E.D.Pa.1943) *aff'd per curiam,* 330 U.S. 806, 67 S.Ct. 1078, 91 L.Ed. 1263 (1947) (100%).

Illustrative cases from this court include *Associated Radio Serv. Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1352 & n. 18 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1982) (about 50%, coupled with evidence of

Further, undisputed evidence of low market share may make monopolization an impossibility as a matter of law. *Dimmitt,* 679 F.2d 516, 529. Recent cases by this court hold that market shares of between seventeen and twenty-five percent are legally insufficient to uphold a finding of monopolization, at least absent other compelling evidence that the defendant had monopoly power. *Id.* at 521–31 (17%–25% market share); *American Telephone & Telegraph Co. v. Delta Communications Corp.,* 408 F.Supp. 1075, 1107 (S.D.Miss. 1976), *aff'd per curiam,* 579 F.2d 972 (5th Cir.1978) (adopting district court opinion), *modified on other grounds,* 590 F.2d 100 (5th Cir.1979) (41%); *Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1368 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977) (20%); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 850 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976) (22%). If a market share of seventeen percent will not support a finding of monopolization, then Holiday Inns' market share of approximately four percent [12] certainly will not, especially in the light of a record that contains no suggestion that Holiday Inns had monopoly power despite its low market share. *See, e.g., Fulton v. Hecht,* 580 F.2d 1243, 1246–47 (5th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979).

The Superdome Hotel's claim that Holiday Inns attempted to monopolize the hotel room market must also fail because of Holiday Inns' low market share.

The offense of attempted monopolization has two elements: "(1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt to monopolize the relevant market will be successful." *Dimmitt,* 679 F.2d at 525; *Spectrofuge Corp.,* 575 F.2d at 276. While we "must be particularly wary of the numbers game of market percentage when considering an 'attempt to monopolize' suit," *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 207 n. 2 (5th Cir.1969), a defendant must have some legally significant share of the market before he approaches the level of dangerous probability of success condemned by the attempt provision of section two. *See generally H & B Equipment Co., Inc.,* 577 F.2d 239, 242. *But see Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 453 n. 47 (9th Cir.1979) (dangerous probability of success may be shown either by direct proof of market power or by inference from proven specific intent).

We do not suggest here a market share percentage that of itself rises to the level of legal significance, but note that a share of less than the fifty percent generally required for actual monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present.[13] *United States v. Empire Gas Corp.,* 537 F.2d 296, 306–07 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (approximate market share of 50% insufficient to show attempt in absence of other evidence); *Twin City*

low number of actual competitors and high barriers to market entry); *Heatransfer Corp. v. Volkswagenwerk A.G.,* 553 F.2d 964, 981 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978) (71%–76%); *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1307 (5th Cir.1971); *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1973) (90%); *North Texas Producers Ass'n v. Metzger Dairies, Inc.,* 348 F.2d 189, 194 (5th Cir.1965), *cert. denied,* 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966) (85%–90%); *Credit Bureau Reports, Inc. v. Retail Credit Co.,* 358 F.Supp. 780, 790–91 (S.D.Tex.1971), *aff'd* 476 F.2d 989 (5th Cir.1973) (85%).

Two important cases in which courts found actual monopolization include *United States v. Aluminum Co. of America,* 148 F.2d 416, 425 (2d Cir.1945) (90%) and *United States v. Eastman Kodak Co.,* 226 F. 62, 79 (W.D.N.Y.1915), *appeal dismissed,* 255 U.S. 578, 41 S.Ct. 321, 65 L.Ed. 795 (75%–80%).

**12.** *See supra,* note 2.

**13.** Consideration of these factors is consistent with the case-by-case approach to monopolization and attempted monopolization cases suggested by the Supreme Court in *United States v. Columbia Steel Co.,* 334 U.S. 495, 537–28, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948).

*Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1300–01, 1309 (9th Cir. 1982) (24% market share plus anticompetitive conduct supported finding of attempted monopolization); *Hiland Dairy, Inc. v. Kroger Company*, 402 F.2d 968, 974 (8th Cir.1968) (market share of less than 50% might support finding of attempted monopoly in some circumstances but 20% insufficient as a matter of law); *McDonald v. Johnson & Johnson*, 537 F.Supp. 1282, 1345–46 (D.C.Minn.1982) (37% sufficient to prove attempted monopoly under the specific market conditions shown). In *Yoder Brothers, Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347 (5th Cir.1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977), a case in which the defendant controlled twenty percent of the market but barriers to entry were high, this court declined to find attempted monopolization. *Id.* at 1368–69.

While the exact market share percentage necessary to prove attempt to monopolize may vary under differing market conditions, absent a showing of special market conditions, a market share of less than ten percent, as a matter of law, usually will not support a finding of attempt to monopolize. *See Whitten v. Paddock Pool Builders*, 508 F.2d 547 (1st Cir.1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975) (3%); *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 297 (7th Cir.1974) (3%); *Harris v. Atlantic-Richfield Company*, 469 F.Supp. 759, 763 (E.D.N.C.1978) (3%); *I. Haas Trucking Co. v. New York Fruit Auction Corp.*, 364 F.Supp. 868, 874–75 (S.D.N.Y.1973) (10%). *See also Giant Paper & Film Corporation v. Albemarle Paper Co.*, 430 F.Supp. 981 (S.D.N.Y.1977) (14% of the market insufficient to withstand defendant's motion for summary

judgment). If ten percent of the market is insufficient as a matter of law, certainly the four percent held by Holiday Inns[14] also is insufficient.[15]

### C.

■ Section seven of the Clayton Act prohibits a corporation from acquiring the stock or assets of another corporation "in any line of commerce" in which the effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. As under section two of the Sherman Act, the first step in analyzing a section seven claim is defining the relevant product and geographic markets. *See United States v. Pabst Brewing Company*, 384 U.S. 546, 548, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966). As previously explained, the relevant market in this case is hotel rooms in downtown New Orleans,[16] and Holiday Inns holds, at most, a little more than four percent of this market.[17] Our holding that on the facts of this case, Holiday Inns does not control enough of the market to violate the Sherman Act, however, does not dispose of the section seven issues, however, for section seven is much broader than the Sherman Act. *Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 38 (5th Cir.1977) (Tjoflat, dissenting). A defendant need not have a market share approaching monopoly proportions to be within the reach of section seven.

■ Congress enacted the current version of section seven out of concern over increasing economic concentration, and to address the problem of incipient monopolies not yet within the reach of the Sherman Act.[18] *Brown Shoe*, 370 U.S. at 317–

14. *See supra* note 2.

15. We note also that the Superdome Hotel has failed to produce any evidence that Holiday Inns had the illegal intent necessary to find a section two violation when it acquired the Chateau LeMoyne.

16. In *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), the Supreme Court noted that "[w]ithout

exception, the Court has treated 'section of the country' and 'relevant geographic market' as identical." *Id.* at 620, 94 S.Ct. at 2869, 41 L.Ed.2d at 995 (footnote omitted).

17. *See supra* note 2.

18. As originally enacted in 1914, § 7 of the Clayton Act applied only to stock acquisitions. In 1950 Congress amended the Act to apply to asset acquisitions as well. The impetus for the

18, 82 S.Ct. at 1520, 8 L.Ed.2d at 531–32. Thus, courts, in applying section seven, must assess the probability of anticompetitive results flowing from the challenged merger or acquisition. *United States v. General Dynamics Corporation*, 415 U.S. 486, 505, 94 S.Ct. 1186, 1198, 39 L.Ed.2d 530 (1974).

■ The plaintiff in a section seven suit may make a prima facie showing of probable anticompetitive impact in one of two ways. He may show merely that the size of the entities involved "makes them inherently suspect in light of Congress' design to prevent undue [economic] concentration," thereby resulting in a "significant" increase in market share and an "undue" market concentration. *United States v. Philadelphia National Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915, 945 (1963). If, however, the size of the entities involved is not "inherently suspect," then the plaintiff may show that other characteristics of the market make the merger or acquisition more economically harmful than the bare market share and market concentration statistics otherwise indicate. *Cf. Brown Shoe*, 370 U.S. at 343–44, 82 S.Ct. at 1534, 8 L.Ed.2d at 546–47. *See generally* L. Sullivan, *Antitrust* § 204 at 616–26 (1977).

In the *Philadelphia National Bank* case the government challenged a merger of the second and third largest commercial banks in the Philadelphia metropolitan area. The resulting bank would have been the largest bank in the area, controlling approximately thirty percent of the commercial banking market. Before the merger, the two largest banks in the area controlled approximately forty-five percent of the market. After the merger, the two largest banks would have controlled approximately sixty percent. 374 U.S. at 331, 364–65, 83 S.Ct. at 1724, 1742, 10 L.Ed.2d at 945, 946. The Supreme Court, "without attempting to specify the smallest market share which

would still be considered to threaten undue concentration," held that a market share of thirty percent and a concentration increase of fifteen percent threatened competition within the meaning of the Clayton Act. 374 U.S. at 364, 83 S.Ct. at 1742, 10 L.Ed.2d at 945.

■ The record before us does not contain specific data regarding market concentration before or after Holiday Inns acquired the Chateau LeMoyne. The evidence does suggest, however, that the market is competitive, and not dominated by a few very powerful hotels or hotel chains.[19] In the light of this fact and the fact that Holiday Inns' holds four percent of the hotel room market, as a matter of law, this acquisition is not "inherently suspect" within the meaning of *Philadelphia National Bank*.

If a plaintiff fails to make a prima facie case on the basis of bare market share and concentration statistics, he still may survive a motion for summary judgment if he shows other factors indicating that the merger or acquisition threatens competition in the relevant market. *See* Sullivan, § 204(b) at 616–622 (1977).

In *United States v. Pabst Brewing Company*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d at 765 (1966), the Supreme Court reversed a summary judgment rendered in favor of the defendant when the plaintiff's evidence showed that the challenged merger would give the resulting entity 4.49 percent of the national market; 11.32 percent of the market in the three state area of Wisconsin, Illinois and Michigan, and 23.95 percent of the market in Wisconsin. 384 U.S. at 553–54, 86 S.Ct. at 1669, 16 L.Ed.2d at 771–72. An additional factor that the Court considered relevant was the trend toward concentration in the industry. *Id.* at 551, 86 S.Ct. at 1668, 16 L.Ed.2d at 770. *See also Universal Brands*, 546 F.2d at 38 (Tjoflat, dissenting).

---

amendment was the threat to economic and social values the perceived trend toward economic concentration throughout the nation was thought to pose. *See Brown Shoe*, 370 U.S. at 311–15, 82 S.Ct. at 1516–1519, 8 L.Ed.2d at 527–530 (synopsizing legislative history).

**19.** *See supra* note 6.

In the *Brown Shoe* case the Supreme Court held that a merger giving a defendant control over only five percent of the relevant market violated section seven. The opinion, however, emphasized several factors that made the challenged merger anticompetitive within the meaning of section seven. The factors include the fact that in some cities in the relevant multi-city geographic market the merged entity would have controlled up to thirty-four percent of the product market, the fact that the acquiring entity was a large national chain with integrated manufacturing operations, and the fact that a history of, or trend toward, concentration already threatened the relevant product market. 370 U.S. at 343–45, 82 S.Ct. at 1534, 8 L.Ed.2d at 546–47.

In *United States v. General Dynamics Corporation*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), the Supreme Court affirmed the district court's grant of summary judgment for the defendant on the basis that raw market share and concentration statistics based on past production did not accurately reflect the likely trend of the industry in the future when the relevant product market was coal, a finite natural resource, and the industry as a whole was declining. *Id.* at 501, 94 S.Ct. at 1195, 39 L.Ed.2d at 544. Though the holding in *General Dynamics* remains largely unexplained,[20] it underscores the importance in section seven cases of evidence of market conditions.

In this case the Superdome Hotel, even in the face of Holiday Inns' motion for summary judgment, has failed even to allege that the market is in such a condition that Holiday Inns' acquisition threatens competition. During the four years this case has been in litigation the Superdome Hotel has had ample opportunity to uncover any factors unfavorable to the merger, but the record indicates it has failed to do that as well. Given this total absence of material supporting data and legal argument, the district court correctly denied the Superdome Hotel's section seven claim.

## IV.

In this opinion we have attempted to give full attention to each of the Superdome Hotel's allegations. In so doing, we have affirmed the district court's holding that Holiday Inns did not breach any explicit or implied term of its contract with the Superdome Hotel. We also have held that the relationship between a franchisor and franchisee generally is not a fiduciary relationship.

We also have affirmed the district court's granting of summary judgment on the Superdome Hotel's antitrust allegations. We have held that the Sherman Act section one claim is without merit because this case does not involve conspiracy or concerted activity. We also have held that, absent unusual circumstances, one brand cannot constitute a relevant product market. We have held that in the hotel room product market, Holiday Inns' market share is not large enough to violate section two of the Sherman Act under either a monopolization claim or an attempted monopolization claim. Finally, we have held that the plaintiff had failed to allege or raise any facts which would prove that Holiday Inns' acquisition of a second independent hotel lessens competition within

**20.** In *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), the Court cited *General Dynamics* for the proposition that a defendant may rebut a prima facie showing of probable anticompetitive effect based on market and concentration statistics by showing that the statistics do not accurately reflect the probable effect of the merger or acquisition on competition. 418 U.S. at 631, 94 S.Ct. at 2874, 41 L.Ed.2d at 1001. *See also Kaiser Aluminum & Chemical Corporation v. F.T.C.*, 652 F.2d 1324, 1336–37 (7th Cir.1981) (discussing *General Dynamics* in context of other section seven cases). The concentration of the affected market in *Marine Bancorporation* was high—three banks controlled 92.3% of the relevant market. The target company held 86.6% of the market, and the acquiring company held none of the actual market, but was a significant potential competitor. 418 U.S. at 606–09, 94 S.Ct. at 2862–63, 41 L.Ed.2d at 987–88. Apparently the market share and market concentration data was "inherently suspect" within the meaning of *Philadelphia National Bank*.

the meaning of section seven of the Clayton Act.

The decision of the district court granting summary judgment to the defendant Holiday Inns is, therefore,

AFFIRMED.