**In re EDUCATIONAL TESTING SERVICE PRAXIS PRINCIPLES OF LEARNING AND TEACHING: GRADES 7–12 LITIGATION.**

**This Document Relates To: All Cases.**

**MDL No. 1643.**

United States District Court, E.D. Louisiana.

Dec. 1, 2005.

## ORDER AND REASONS

VANCE, District Judge.

The defendant, Educational Testing Service, moves to dismiss a number of plaintiffs' claims, including the claim for monopolization under Section 2 of the Sherman Act. In this opinion, the Court addresses only the Sherman Act issues. Because plaintiffs have failed to allege conduct that amounts to monopolization under the federal antitrust laws, the Court grants ETS's motion to dismiss plaintiffs' antitrust claim.

## I. INTRODUCTION

This is a multidistrict proceeding consisting of 28 class and individual actions brought against Educational Testing Service in the wake of scoring errors committed by ETS in the administration of one of its teacher certification exams, the Praxis Principles of Learning and Teaching: Grades 7–12. Between January 2003 and April 2004, ETS graded a portion of the test too stringently, which resulted in test scores that were too low for about 40,000 test takers. At least 4,100 test takers received false failures, while the rest received lower than accurate scores.

The Court ordered the plaintiffs to file an administrative master complaint that would incorporate all of the claims in the various complaints. The resulting master complaint seeks to certify one class for plaintiffs' state law claims (breach of contract, negligence, negligent misrepresentation) and a separate class for their federal antitrust claim. The following discussion focuses on the allegations in the antitrust claim.

## II. DISCUSSION

### A. Rule 12 Standard

ETS moves to dismiss plaintiffs' antitrust claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Rule 12(b)(6) standard of review is a familiar one. On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff. *See Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996); *American Waste & Pollution Control Co. v. Browning–Ferris, Inc.,* 949 F.2d 1384, 1386 (5th Cir.1991). The Court must resolve doubts as to the sufficiency of the claim in plaintiff's favor. *Vulcan Materials Co. v. City of Tehuacana,* 238 F.3d 382, 387 (5th Cir.2001). The claim should be dismissed only if it appears that the plaintiff cannot prove any set of facts in support of the claim that would entitle the plaintiff to relief. *Id.; Piotrowski v. City of Houston,* 51 F.3d 512, 514 (5th Cir.1995).

### B. Plaintiffs' Allegations

Plaintiffs allege that ETS enjoys a monopoly in the market for teacher certification testing. According to plaintiffs, nearly 80 percent of the states that use tests in their licensing process for teachers require one of the Praxis tests marketed by ETS. In addition, plaintiffs assert that the Praxis series is currently required for teacher licensing in 39 states and U.S. jurisdictions. Allegedly, ETS has only two small competitors in the teacher certification testing market, National Evaluations Systems and ABCTE. Plaintiffs assert that two these companies operate in only a handful of states.

Plaintiffs further allege that entry barriers exist in the market for teacher certification testing. These entry barriers assertedly are high capital costs, "network effects" (*i.e.,* the more people take the

Praxis test, the more states use the Praxis test for certification), and "regulatory barriers." Plaintiffs contend that potential entrants confront regulatory barriers because they must convince state legislatures to adopt their tests for teacher certification. The plaintiffs also allege that ETS's ability to assert that its tests have been "validated" over the years is another barrier to entry.

Plaintiffs state that the teacher certification testing market is the relevant product market for antitrust purposes and that it is national in scope. Plaintiffs also allege that there is a separate relevant market with separate competitors for "ancillary products and services relating to Praxis tests." This market is also said to be national in scope. It purportedly includes products like Praxis test preparation guides and Praxis test review courses. Despite the allegations that the primary product market is the market for teacher certification testing with an ancillary market for Praxis test preparation and review, plaintiffs allege elsewhere in the master complaint that the market that ETS monopolizes is the market for its own Praxis tests.

Plaintiffs further allege that ETS has engaged in two practices that amount to an abuse of its monopoly power. Plaintiffs complain that ETS refuses to disclose its test booklets and answer sheets on completed tests to the test takers or to its competitors. According to plaintiffs, this practice is both an unlawful use of monopoly power in the relevant market and amounts to unlawful leveraging into "ancillary product and services markets." Plaintiffs complain that ETS engaged in illicit leveraging to "gain a competitive advantage in the market for Praxis training and review." Plaintiffs object that while ETS refuses to disclose its test books and answer sheets to competitors, it uses them

itself to develop products for the ancillary market, such as its Diagnostic Preparation Program, a product providing customized feedback about test performance, which debuted in September 2003.

Plaintiffs also object to a $40 late registration fee that ETS charges candidates who register for Praxis tests after the advertised registration deadline. Plaintiffs complain that ETS's conduct is abusive because those test takers who want to retake a Praxis test after they fail one have no alternative but to pay the late fee because ETS does not furnish test results on the first test in time to register timely for the next administration of the test. Plaintiffs admit that by April 2004, ETS changed its policy. It began to give automatic refunds of all registration fees to candidates who register for a test before they are notified that they received a passing score on an earlier test. Plaintiffs also mention that even before the change in policy, registrants could avoid the late fee, but they had to pay $25 to receive early score notification by telephone. Plaintiffs contend that there is no legitimate reason why ETS could not simply waive the late registration fee for those who failed an earlier test.

ETS contends that plaintiffs have failed to state a claim for monopolization because they have failed to allege a relevant market and because they have failed to allege exclusionary conduct within the meaning of the antitrust laws. Because the Court finds that the conduct plaintiffs attack is not exclusionary under the antitrust laws, they have failed to state a claim for monopolization, and their antitrust claim must be dismissed.

**C. Monopolization under Section 2 of the Sherman Act**

Section 2 of the Sherman Act forbids monopolization and attempts to

monopolize. 15 U.S.C. § 2. The offense requires both the possession of monopoly power in the relevant market and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). As the United States Supreme Court made clear in *Verizon Communications, Inc. v. Law Offices of Curtis ·V. Trinko, LLP*, 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." 540 U.S. at 407, 124 S.Ct. 872.

### 1. The Monopoly Power Element

■ To state a claim under Section 2, plaintiffs must allege that ETS possesses monopoly power in a relevant market that has both product and geographic dimensions. *See, e.g., Dickson v. Microsoft Corp.*, 309 F.3d 193, 212–13 (4th Cir.2002) (absence of allegation of market power or share of relevant market precluded conspiracy to monopolize claim). Plaintiffs must plead facts sufficient to support this element to survive a motion to dismiss. *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir.1992); *see Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1077–78 (11th Cir.2004) (plaintiffs must allege facts in support of each element of an antitrust violation).

■ The allegation that defendant holds a predominant share of the relevant market will usually satisfy the market power element of a monopolization claim. *See, e.g., Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698 ("[ T]he existence of such [monopoly] power ordinarily may be inferred from the predominant share of the market."); *U.S. Anchor Mfg. Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir.1993) (principal measure of monopoly power is market share). The case law supports the conclusion that a market share of more than 70 percent is generally sufficient to support an inference of market power. *See, e.g., Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (factfinder can infer monopoly power from an 80 percent market share); *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 n. 3 (8th Cir.1994) (share of more than 80 percent sufficient); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 981 (5th Cir.1977) (71– 76 percent share sufficient); *Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 893 F.Supp. 1207, 1217–18 (S.D.N.Y.1994) (70 percent market share generally adequate at the pleading stage); ABA Section of Antitrust Law, *Antitrust Law Developments* 235 (5th ed.2002) (collecting cases). Allegations of significant barriers to entry in addition to a predominant market share fortify the inference of monopoly power because impediments to entry allow the dominant firm to raise prices without attracting competitors to undercut them. *See generally Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1190–91 (5th Cir.1985) (ease of entry, among other things, precludes finding of market power); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir.1995) (ease of entry will result in undercutting monopoly prices); *Allen–Myland, Inc. v. Int'l Bus. Machs. Corp.*, 33 F.3d 194, 209–10 (3d Cir.1994) (reversing finding of no monopolization when lower court erroneously found entry barriers to be low).

Plaintiffs' allegations of the relevant market are inconsistent and confusing. On the one hand, plaintiffs allege that teacher certification testing constitutes the

relevant product market, and that nearly 80 percent of the states that use tests to certify teachers use ETS's Praxis tests. This consists of 39 states and U.S. jurisdictions. Plaintiffs allege that the geographic market for teacher certification testing is national in scope. They also posit the existence of certain barriers to entry into this market, e.g., high capital costs, "network effects," and "regulatory barriers." Further, they allege (conclusorily, it is true) that ETS enjoys the power to control prices and exclude competition in the relevant market.

■ Elsewhere in the complaint, however, plaintiffs allege that "ETS possesses monopoly power in the market for Praxis testing" and that the monopolization they challenge consists of the willful maintenance of monopoly power in that market. Defendant focuses on these assertions and correctly points out that a monopoly over one's own product is generally not a basis for Section 2 liability. *TV Commc'ns Network*, 964 F.2d at 1025 (allegation that company monopolized its own product is defective as a matter of law); *Elliott v. United Center*, 126 F.3d 1003, 1005 (7th Cir.1997) (noting rejection of proposition that single firm can have monopoly power over own product absent proof that product has no substitutes); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir.1984) (rejecting product market limited to Holiday Inn hotel rooms); *see* IIA Phillip E. Areeda, Herbert Hovencamp, & John L. Solow, *Antitrust Law* ¶ 563d (2d ed. 2002) ("A single brand ... within a product class is presumptively not a separate market, unless its maker is the only producer in a relevant category...."). Courts recognize an exception when a firm totally dominates a market with its product, so that any action to increase its control is inherently anticompetitive. *Domed Stadium Hotel, Inc.*,

732 F.2d at 489 n. 9; IIA Areeda, Hovencamp, & Solow, *supra*, ¶ 563d. ETS certification tests do not amount to the relevant market because, as plaintiffs concede, there are two other companies that market teacher certification tests which compete with ETS.

■ Plaintiffs do not explain the inconsistency in their allegations. Instead, they focus their arguments on the allegations that the teacher certification testing market is the relevant product market. As to those allegations, the Court finds that plaintiffs have satisfactorily pleaded, although barely, the monopoly power element of a monopolization claim. It is true that plaintiffs do not identify all of the states that make up the nearly 80 percent that use ETS's Praxis tests or what percentage of test takers they represent. Nevertheless, the Court cannot state that there is no set of facts that the plaintiffs could prove in support of their allegations that would amount to the possession of monopoly power.

### 2. The Conduct Element

■ Plaintiffs allege that ETS engaged in anticompetitive conduct that maintained its monopoly. Under these circumstances, to satisfy the conduct element of the offense of illegally maintaining monopoly power, plaintiffs must allege acts that are reasonably capable of enlarging or prolonging monopoly because (1) they impair opportunities of rivals, *and* (2) fail to benefit consumers, are unnecessary to produce a given benefit to consumers, or are outright harmful to consumers. *See* III Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651 (2d ed.2002); *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1188 (1st Cir. 1994) (monopolization inquiry is whether monopolist erected barriers to competition and frustrated consumer preferences).

Here, plaintiffs challenge ETS's imposition of late registration fees and its failure to make its test booklets and answer sheets available to consumers and to competitors.

### (a) Late Fees

ETS charges a $40 late registration fee to applicants who fail to register by its advertised deadline. Plaintiffs challenge the late registration fee as an exclusionary practice only as it relates to test takers who fail a Praxis test and wish to register to retake the next one. Until April 2004, such a test taker could not avoid the late registration fee because ETS did not release test results on one test soon enough for the applicant to register in a timely way for the next test. Plaintiffs concede that the applicant could escape the late registration fee by paying $25 extra to receive early score notification by telephone. In April 2004, ETS began to give automatic refunds of all registration and penalty fees if a person signed up for a test before the person was notified that he or she passed an earlier test.

The Court holds that plaintiffs have not advanced a plausible theory to explain how ETS's charging of a $40 late registration fee is anticompetitive. *See generally Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The possession of monopoly power and the charging of a monopoly price, are not, without more, illegal. As the United States Supreme Court observed recently in *Trinko,* "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful, it is an important element of the free-market system." *Trinko,* 540 U.S. at 407, 124 S.Ct. 872. Furthermore, that a monopolist charges a high price "enhances [competitors'] opportunities." III Areeda & Hovenkamp, *supra,* ¶ 561e. *See gener-*

*ally Matsushita,* 475 U.S. at 583, 106 S.Ct. 1348 (competitors stand to gain from conspiracy to raise market prices). Here, there is nothing about the $40 late fee that would be reasonably expected to impair the opportunities of rivals.

Furthermore, plaintiffs admit that ETS cannot raise prices to "full monopoly levels" because if it did, state legislatures, which select the testing company, would consider their "alternatives." There is no plausible reason why this constraint on ETS's ability to exact monopoly prices would not operate equally well on its charging of late fees, if the states found them excessive. Indeed, ETS modified its policy before these lawsuits were filed and before it notified plaintiffs that there had been an error in the scoring of their tests. Plaintiffs do not assert that they were not informed that they would be charged a late fee if they registered after the deadline. Nor do they allege that the late fee amounted to a tying arrangement or even that late registration fees, as such, lack business justification. Although plaintiffs assert that there is no legitimate reason that ETS cannot simply waive late fees for those who register to retake a failed Praxis test, this assertion, without some theory as to how the fees inhibit rivals, does not amount to a viable theory of antitrust liability.

### (b) Failure to Make Tests Available to Competitors and Customers

Plaintiffs allege that ETS's failure to make its test booklets and answer sheets available to its competitors and to plaintiffs amounts to exclusionary conduct in the market for teacher certification testing. Again, plaintiffs have advanced no plausible theory to explain how this conduct is anticompetitive. Absent unusual circumstances not alleged here, a monopolist has no duty to come to the assistance of its competitors. *See Trinko,*

540 U.S. at 408–11, 124 S.Ct. 872. *See generally* IIIA Areeda & Hovencamp, *supra,* ¶ 765b (monopolist has no general duty to deal with rivals). As Judge Diane Wood wrote in *Goldwasser v. Ameritech Corp.,* 222 F.3d 390, 400 (7th Cir.2000), a "complaint ... which takes the form 'X is a monopolist; X didn't help its competitors enter the market so that they could challenge its monopoly; the prices I must pay X are therefore still too high' does not state a claim under Section 2." This follows because "the antitrust laws do not impose that kind of affirmative duty, even on monopolists." *Id.* And plaintiffs clearly cannot shoehorn their allegations into the paradigm of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), in which the United States Supreme Court found illegal monopolization when a monopolist refused to deal with its competitor. In *Aspen Skiing Co.,* which the Supreme Court has described as "at or near the outer boundary of Section 2 liability,"[1] a monopolist changed a course of dealing with a competitor that had been producing cash revenues and that had been an efficient method of doing business solely to drive the competitor out of business. There is no allegation that ETS changed a profitable course of dealing with a competitor to the detriment of that competitor. Furthermore, plaintiffs concede that two other companies are capable of developing marketable teacher certification tests without any help from ETS. The Court holds that ETS's conduct in not releasing its testing materials to competitors or customers is not exclusionary conduct in violation of the antitrust laws.

#### (c) *Monopoly Leveraging*

Plaintiffs assert that ETS uses its monopoly power in the teacher certification testing market as leverage to gain a "competitive advantage" in the "ancillary market" for Praxis test preparation and diagnostic products and services. ETS allegedly does so by withholding its tests and answer sheets from customers and competitors while it uses those materials to develop its own products for the secondary market. Plaintiffs fail to allege ETS's market share in the separate, "ancillary" market for products and services relating to Praxis tests. Nor do plaintiffs allege that ETS has monopoly power in that market or that there is a dangerous probability that it will succeed in monopolizing that market. Absent such allegations, its claim of monopoly leveraging fails. *See Trinko,* 540 U.S. at 415 n. 4, 124 S.Ct. 872 (dangerous probability of success in monopolizing a second market is required for monopoly leveraging claim). Furthermore, "leveraging presupposes anticompetitive conduct," *id.,* and the Court has already held that plaintiffs' conduct allegations do not amount to anticompetitive conduct.

### III. CONCLUSION

For all of the foregoing reasons, plaintiffs' monopolization claims under Section 2 of the Sherman Act must be dismissed.

---

1. *Trinko,* 540 U.S. at 409, 124 S.Ct. 872.