**JUNIOR MONEY BAGS, LTD.,**
**a Louisiana Corporation**

v.

**Moey SEGAL.**

**Civ. A. Nos. 89–4548, 89–4560.**

United States District Court,
E.D. Louisiana.

Oct. 24, 1990.

---

Jerry A. Brown, New Orleans, La., for plaintiff.

Walter J. Leger, Jr., New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McNAMARA, District Judge.

This matter was tried to the court without a jury on a previous day. Now, after considering the evidence and the memoranda of counsel, the court enters the following Findings of Fact and Conclusions of Law. To the extent any Findings of Fact are deemed to be Conclusions of Law, they should be so considered and to the extent any Conclusions of Law are deemed to be Findings of Fact, they too should be so considered.

### FINDINGS OF FACT

1. The parties to the present litigation are Junior Money Bags, Ltd. ("Money Bags"), a Louisiana corporation, Blaine S. Kern ("Kern"), a resident of the Eastern District of Louisiana, and Moey Segal ("Segal"), a Canadian citizen with several residences in the United States, but none in Louisiana.

2. To facilitate the construction and operation of an aerial crossing transportation system (the "gondola") over the Mississippi River in New Orleans, Mississippi Aerial River Transit–Perez, Inc. ("MART") entered into a contract with Money Bags to lease real estate owned by Money Bags situated on the westbank of the Mississippi River. MART used the land leased from Money Bags to construct and maintain the westbank support tower for the gondola. MART also entered into a lease with the City of New Orleans to construct the tower support on the eastbank of the Mississippi River. MART obtained financing for the gondola through Banque de L'Union Europeenne ("BUE").

3. After MART defaulted on the loan, BUE filed suit in the United States District Court for the Eastern District of Louisiana, Civil Action Number 86–974 ("the BUE suit").

4. On October 31, 1986, a consent judgment was rendered in favor of BUE and against MART, recognizing and maintaining BUE's security interest, including its interest in the lease with Money Bags.

5. Subsequently, Segal purchased the judgment in favor of BUE. On May 4, 1989, the district court issued an order in the BUE suit substituting Segal as the judgment creditor, entitled to exercise all of the rights granted by the security agreements and recognized by the consent judgment.

6. Segal caused a marshal's sale of the gondola and was the successful bidder at the sale held August 10, 1989 at which he acquired all of the property, including the lease with Money Bags, subject to the BUE mortgage.

7. At the time Segal purchased the judgment from BUE and on August 10, 1989 when he acquired the property at the marshal's sale, he anticipated potential legal problems in acquiring the necessary air and surface rights to make the gondola operational in New Orleans.

8. Segal erroneously thought, however, that the scrap value of the property purchased equalled the purchase price and thus it was a no risk transaction.

9. After the sale, Segal approached both Money Bags and representatives of the City of New Orleans in an attempt to bring the gondola back into operation.

10. The first meeting between Segal and the president of Money Bags, Kern, was not productive. Segal stated that his terms were not negotiable. When Kern demurred, Segal told Kern that he would regret not having given in to Segal's demands.

11. Segal and his then counsel, William H. Dutel ("Dutel"), approached Kern in the middle of September 1989 to see if Money Bags would grant Segal a servitude agreement. Kern said he thought they could agree but that his attorney, Leon H. Rittenberg, Jr. ("Rittenberg"), would have to approve the servitude.

12. On September 19, 1989, Dutel, one of several attorneys who has represented Segal, forwarded to Rittenberg a proposed servitude agreement.

13. Two days later, on September 21, Rittenberg wrote Dutel to ask for a copy of Segal's deed from the United States Marshal. Although Rittenberg was aware that Segal had been present personally at the marshal's sale, he did not know if Segal had submitted the bid in his own name or on behalf of some other entity. Despite protests by Dutel that Rittenberg's request for the deed was unreasonable, later developments (Segal's transfer of his interest to a shell corporation) showed that the request was not unreasonable.

14. On September 22, 1989, Rittenberg wrote to Dutel to advise him that the servitude agreement was not acceptable and to suggest that Segal consider an amendment to the Money Bags/MART lease. The suggested amendment reduced the cash rental to $1.00 per year.

15. Rittenberg also informed Dutel that he thought an amendment to the lease could be drafted within a day's time and also assured him that Money Bags was eager to confect an agreement with Segal.

16. On October 3, 1989, Rittenberg again wrote to Segal's counsel reiterating "that Junior Money Bags is quite interested in working with Mr. Segal to reactivate the gondola and would therefore like to invite Mr. Segal to meet" to work out an agreement.

17. On the same day, Mayor Barthelemy contacted Rittenberg and asked him to attend a meeting in the Mayor's office. Rittenberg advised the Mayor that he thought it was more appropriate for Money Bags and Segal to negotiate directly, but agreed to attend the meeting.

18. Present at the meeting held on October 3 in the Mayor's office were Mayor Barthelemy, his administrative assistant Stewart Walker, the Mayor of Gretna, Rittenberg, and Larry C. Becnel ("Becnel"), another attorney for Kern.

19. Although invited, neither Segal nor his attorney attended the meeting, but while the meeting was in progress the Mayor received a telephone call from Segal. At Segal's request the Mayor asked Rittenberg and Becnel to leave the meeting while he spoke on the telephone to Segal.

20. On the same eventful day, Segal began moving some of the gondola cars. The move was not attempted quietly. Instead, Segal engaged a New Orleans-style brass band providing background music to call media attention to the fact that the gondola was leaving New Orleans. The incident was reported on local television and Segal read from a prepared press release.

21. The very next day, October 4, 1989, the City filed suit in state court against Segal and sought a writ of sequestration, alleging that Segal was liable to the City for unpaid rent under the MART/City lease.

22. On October 5, 1989, Segal and the City reached an agreement under which the City dismissed the suit without prejudice, and Segal agreed to give the City at least seven days notice if he decided to move the gondola.

23. On October 11, 1989, Segal's counsel gave the City seven days notice. In that letter, Segal also notified the City that he would not "exercise his option under the marshal's deed ... to accept and assume MART's position with regard to the lease with the City...." *Money Bags did not learn of this letter until June 1990.*

24. On October 12, 1989, (Exhibit J), Segal's attorney Dutel advised Money Bags that "[his] client" did not feel bound by any lease and sought permission to remove the gondola tower from Money Bags' property. The letter did not name Segal as the client.

25. By letter dated October 13, 1989, (Exhibit K), Rittenberg asked Segal's attorney to identify his client and also asked for Segal's address. The letter also asked for the legal basis for Segal's right to remove only the tower. Finally, the letter stated that Money Bags could not grant Segal permission to remove the tower at that time, but stated that Money Bags was willing to reconsider its decision based upon the response from Segal's attorney.

26. At their initial meeting in August of 1989, Kern expressed concern regarding potential liability to third parties with re-

gard to the existing tower in that an aircraft warning light was extinguished and neighborhood children were sometimes found climbing the tower.

27. Because of these concerns, while neither Kern or Money Bags has ever made any use of this tower or derived any benefit from it since the gondola ceased operation several years ago, they have found it necessary to purchase liability insurance to provide protection from potential claims.

28. Four days later, on October 17, 1989, Segal's attorney acknowledged receipt of Money Bags' October 13 letter and stated that Money Bags had acted arbitrarily to prevent Segal from obtaining this tower. Segal demanded payment of $15,-000,000 in cash, in default of which suit would be filed against Money Bags immediately. (Exhibit L)

29. Without notice to Money Bags, Segal had filed a motion in the BUE suit on October 11, 1989, seeking a declaration of his rights and obligations with respect to the MART/City of New Orleans lease. Money Bags was not named in or served with papers and did not participate in that suit. Segal's motion was dismissed by Judge Feldman on November 15, 1989.

30. On October 18, 1989, the City filed a second suit against Segal in state court that later was removed to this court. The City again sought a sequestration of Segal's property.

31. On the same day, Money Bags filed the instant suit, seeking a writ of nonresident attachment against Segal's property obtained in the marshal's sale as the predicate for personal jurisdiction.

32. Despite claims by Segal that the City and Money Bags conspired against him, there is no evidence that either Plaintiff knew prior to filing that the other was filing suit against Segal.

33. After filing the initial Complaint in this matter, Money Bags later amended the Complaint to reduce substantially the property sought to be attached. The attachment of only the reduced amount of property was perfected on or about October 24, 1989.

34. Segal never filed a motion to bond out the property attached by Money Bags.

35. On November 7, 1989, Segal filed a motion to increase the bond posted by Money Bags in the attachment suit. Prior to the hearing on the motion, Segal answered Money Bags' Complaint and filed a counterclaim against Money Bags. When Segal thus submitted himself to the jurisdiction of the court, Money Bags released its attachment effective November 21, 1989.

36. Subsequently, Segal moved for a summary judgment dismissing the claims by Money Bags. The court on May 21, 1990 granted Segal's motion and at the same time granted Money Bags relief by dissolving the lease. A subsequent motion for summary judgment dismissing Segal's claims was filed by Money Bags and Kern, but was denied by the court on July 12, 1990 except that the claim for intentional interference with contracts was dismissed.

## CONCLUSIONS OF LAW

1. Segal's claims against Money Bags are based on theories of abuse of process, abuse of rights, tortious inference with business relations and conversion. Since these claims arise under state law, Louisiana law establishes the sufficiency of evidence for the claims. *Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.*, 739 F.2d 1028 (5th Cir.1984).

2. As the Plaintiff-in-Counterclaim, Segal bears the burden of proving his case. *Derouen v. State Farm Mut. Auto Ins. Co.*, 445 So.2d 139 (La.App. 3rd Cir.1984).

3. A person who asserts a fact must carry the burden of proof on that fact, and the fact must be established by a reasonable preponderance of the evidence. *Meyer v. State Dept. of Public Safety License Control and Driver Improvement Division*, 312 So.2d 289 (La.1975).

4. Louisiana does not recognize a civil action for conspiracy in and of itself. *Louisiana v. McIlhenny*, 201 La. 78, 9 So.2d 467 (1942).

5. The cause of action is not the conspiracy itself, but rather the tort the al-

leged conspirators agreed to perpetrate and which they actually committed in whole or in part. *Silver v. Nelson,* 610 F.Supp. 505 (E.D.La.1985).

■ 6. For a conspiracy to exist, there must be "unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

7. There is no evidence to support Segal's allegations that a conspiracy existed between Money Bags and/or Kern on the one hand and Mayor Sidney Barthelemy on the other hand. There is no evidence that the City and/or the Mayor and Money Bags and/or Kern had any interest in common other than obtaining a judicial declaration that Segal was bound by the obligations of MART under the contracts Segal had acquired at the marshal's sale. Even if they had taken action in concert to obtain such judicial relief, the seeking of such relief would not have been unlawful.

■ 8. The tort of abuse of process, as recognized by Louisiana law, consists of two essential elements: an ulterior purpose and a willful act in the use of process not proper in the regular conduct of proceedings. *Stark v. Eunice Superette, Inc.,* 457 So.2d 291 (La.App. 3d Cir.), *writ denied,* 461 So.2d 316 (La.1984).

■ 9. The writ of attachment, as provided by Articles 3501, *et seq.,* of the Louisiana Code of Civil Procedure, is a proper method for obtaining jurisdiction over a non-resident defendant who has not appointed an agent for service of process in Louisiana, and is proper even if the non-resident is susceptible to jurisdiction under the Louisiana Long–Arm Statute, La.R.S. 13:3201, *et seq.* The long-arm statute specifically provides that other methods of obtaining jurisdiction were not repealed by its enactment. La.R.S. 13:3207. *See also Bowers v. Greene,* 360 So.2d 639 (La.App. 3d Cir.1978), *writ denied,* 362 So.2d 801 (La.1978).

10. If the process complained of by the Plaintiff has been properly brought, the underlying motive for bringing the process is immaterial. *Vasseur v. Eunice Superette, Inc.,* 386 So.2d 692 (La.App.3d Cir. 1980), *writ refused,* 393 So.2d 747 (La. 1981).

■ 11. Even if the writ of attachment was improperly issued, there was no malice or bad faith in the filing by Money Bags of the attachment suit. Segal's counsel had refused to supply an address for Segal where he could be served through the long-arm statute. Use of the non-resident attachment provisions of the Louisiana Code of Civil Procedure was not improper.

12. Segal also has contended that Money Bags filed the attachment suit with the ulterior motive of preventing Segal from removing his property. However, a party against whom an attachment issues can defeat the attachment by furnishing security. *See* La.C.C.P. art. 3507. Segal had the means to defeat the attachment, yet failed to use it.

13. Later, when Segal filed his counterclaim against Money Bags, thereby submitting himself to the jurisdiction of the court, Money Bags released the attachment. Because the attachment suit was to obtain jurisdiction over the property of Segal, a non-resident, it was no longer necessary.

■ 14. To recover under a theory of abuse of rights, Plaintiff must show that he has suffered unnecessarily some harsh consequence as a result of the Defendant's exercising a legal right without legitimate or serious interest. *Morse v. J. Ray McDermott & Company, Inc.,* 344 So.2d 1353 (La.1977). In *Illinois Central Gulf Railroad Company v. International Harvester Company,* 368 So.2d 1009 (La.1979), the Louisiana Supreme Court set forth four basic areas of inquiry for determining whether a right has been abused: (1) whether the right was exercised primarily or exclusively to harm another; (2) whether there was a serious or legitimate interest worthy of protection; (3) whether the right was exercised in violation of moral rules, good faith or elementary fairness; and (4) whether the right was exercised for pur-

poses other than for which the right was granted.

■ 15. The court concludes that no harsh consequence came to Segal due to the filing of the instant Complaint by Money Bags. In the period from October 11, 1989 until November 15, 1989, Segal had pending before Judge Feldman in the BUE proceeding a motion to determine his rights and obligations to the City of New Orleans as a result of the marshal's sale. After Judge Feldman dismissed that motion, the attachment in this suit only lasted an additional seven days, hardly a "harsh" consequence.

16. The court also concludes that Money Bags did not file the attachment suit primarily or exclusively to harm Segal. Money Bags previously had requested from Segal's counsel an address for Segal, but the residence information was not furnished.

■ 17. Segal's other contention, that Money Bags abused its rights by not allowing Segal on its premises to remove the towers, also is without merit. Money Bags did not unequivocally tell Segal he could not come onto its property.

18. Money Bags also had been informed by Segal's counsel that his unnamed client did not consider himself or itself bound by the lease with MART, which lease contained provisions requiring liability insurance to be obtained before any demolition of the gondola system.

19. Money Bags never had the opportunity to raise the issue of insurance again with Segal because immediately after questioning Segal's right to remove the tower without regard to the foundation, Money Bags was presented with a demand for $15,000,000 for a mere three-day delay in granting access to its property.

20. While this court ultimately held in its Minute Entry of July 12, 1990 that Segal was the owner of the westbank tower and entitled to remove it without removing the foundation, Money Bags was not unreasonable in seeking some type of insurance or other protection against potential liability claims as land owner in connec-

tion with the tower removal. There is no evidence that Segal ever offered to provide any such protection.

21. The fact that Segal admitted that he transferred the assets in question to a shell corporation because of liability concerns reflects the reasonableness of Money Bags' concerns.

■ 22. The court also concludes that Segal cannot show that Money Bags tortiously interferred with his business relations. Louisiana law recognizes this cause of action, *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594 (5th Cir.1981), but Segal has failed to show that any communications by Money Bags and/or Kern with third parties caused them not to deal with Segal.

23. Moreover, the court concludes that Segal has failed to show that his negotiations with officials in Corpus Christi had reached the stage where interference with them would have been tortious. Segal's negotiations with Corpus Christi were only in the embryonic stage when Segal himself terminated them. The damage evidence presented was based on inadequate data, speculative and unreliable assumptions and projections. The Corpus Christi inquiry had simply not progressed to the point that any reasonable potential profit could be extrapolated from tourism and Chamber of Commerce projections of unknown reliability.

■ 24. Conversion is the commission of a wrongful act of dominion over the property of another in denial of or in a manner inconsistent with the owner's rights. *Silver v. Nelson*, 610 F.Supp. 505 (E.D.La.1985); *Security Home Mortgage v. Bogues*, 519 So.2d 307 (La.App. 2d Cir. 1988).

■ 25. The filing of the non-resident attachment suit was not an act inconsistent with Segal's ownership. Indeed, in order to file a non-resident attachment, the plaintiff (in this case, Money Bags) must allege that property is owned by the non-resident. La.C.C.P. art. 9. Since a conversion cannot arise from the exercise of a legal right, Segal cannot predicate his claim for conver-

**382**

sion of his property on the attachment suit. *Delort Hardware Co. v. Peoples Bank & Trust,* 490 So.2d 547 (La.App. 4th Cir.1986); *Commercial Credit v. People's Loan Serv.,* 351 So.2d 852 (La.App. 2d Cir.1977).

26. Segal's right to remove the tower was not absolute; it had to take into account the interest of the landowner, Money Bags. Although Money Bags only made reasonable inquiry concerning Segal's removal of the tower, the response of Segal's attorney was to demand immediately $15,000,000 in damages. Considering all the circumstances, including the fact that Money Bags did not make use of the tower in any manner, its conduct did not amount to conversion.

27. Money Bags and Kern are entitled to judgment dismissing Segal's counterclaim with prejudice.