Rogers W. CLARK, et al.

v.

**AMERICA'S FAVORITE CHICKEN CO., et al.**

Civil Action Nos. 93–3029, 95–3833.

United States District Court,
E.D. Louisiana.

Feb. 8, 1996.

Stephen G. Bullock, Stephen H. Kupperman, Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, LA, William David Aaron, Jr., Nancy Eleanor Graham, Brent Bennett Barriere, Bruce Victor Schewe, Phelps Dunbar, New Orleans, LA, Robert V. Seymour, Sallen, Sallen, Seymour & Sallen, Southfield, MI, Jeffrey J. Mayer, Eric J. Wexler, Amy L. Ryntz, Michael M. Jacob, Raymond & Prokop, P.C., Southfield, MI, for plaintiffs.

Steven W. Copley, Ernest Enrique Svenson, Martin E. Landrieu, Gordon, Arata, McCollam & Duplantis, New Orleans, LA, Peter J. Klarfeld, Brownstein, Zeidman & Lore, Washington, DC, Kenneth J. McIntyre, John A. Krsul, Jr., Dickinson, Wright, Moon, Vandusen & Freeman, Detroit, MI, David B. Kaplin, Brownstone, Zeidman & Lore, Washington, DC, James C. Rubinger, Wiley, Rein & Fielding, Washington, DC, for defendant America's Favorite Chicken Co.

James B. Irwin, V, Robert Ellsworth Durgin, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, David F. Graham, Sidley & Austin, Chicago, IL, Eugene Driker, Barris, Scott, Denn & Driker, Detroit, MI, David B. Johnson, Sidney & Austin, Chicago, IL, for defendant Canadian Imperial Bank of Commerce.

Richard Anthony Goins, Mark Raymond Beebe, Adams & Reese, New Orleans, LA, for defendants Frank Belatti, Belatti Consulting Group, Ltd.

## MEMORANDUM AND ORDER

SEAR, Chief Judge.

### Background

Plaintiffs Rogers W. Clark Jr., Roger R. Burney, Franchise Management Unlimited, Inc., and Seven Mile Catering are owners and operators of "Popeyes Famous Fried Chicken & Biscuits" fast-food restaurant franchises in Detroit. They filed this lawsuit against America's Favorite Chicken Company ("AFC") and Canadian Imperial Bank of Commerce ("CIBC").[1] Plaintiffs allege breach of contract, both express and implied, against AFC. Plaintiffs allege detrimental reliance/promissory estoppel; violation of the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"); tortious interference with contract and business relationships; and abuse of rights against both AFC and CIBC. In addition, plaintiffs claim liability of CIBC as principal for promises allegedly made by Frank Belatti and Belatti Consulting Group, Ltd. Plaintiffs also contend that CIBC is liable as a conspirator with AFC and its predecessors for adopting a "dual marketing strategy" that allegedly injured plaintiffs' business.

These causes of action arise from allegations that, since the 1989 merger of Popeyes and Church's Fried Chicken, Inc. ("Church's"), plaintiffs have been harmed by CIBC and AFC, and its predecessors, through marketing policies that allegedly favor Popeyes as upscale stores and Church's as low-scale fried chicken outlets. Plaintiffs contend that both the predecessor of AFC, Al Copeland Enterprises ("ACE"), and AFC promised them that their inner-city Popeyes' franchises would remain competitive with other fast food outlets, particularly Church's. After ACE's predecessor bought Church's, ACE and CIBC, and then, after AFC took over ACE, AFC and CIBC allegedly operated a dual-marketing strategy to restrain, eliminate and lessen competition between Popeyes and Church's.

AFC and CIBC have filed motions for summary judgment with respect to each of plaintiffs' claims. AFC contends that it has not breached any express or implied contractual terms with plaintiffs and that, indeed, the franchise agreements authorize AFC to develop and establish other franchise systems. Concerning the allegation of detrimental reliance, AFC contends that no representation was made by Belatti to purchase plaintiffs' stores and that even if the representation was made, plaintiffs could not have reasonably relied upon it. AFC also maintains that it is not liable under the LUTPA and, alternatively, that plaintiffs' claims thereunder have prescribed. AFC further submits that the undisputed facts do not support claims for tortious interference with business relationships or abuse of rights. Finally, AFC seeks summary judgment on its counterclaim for an accounting of profits related to its ownership of preferred stock in plaintiff Franchise Management Unlimited ("FMU").

CIBC's motion for summary judgment substantially tracks that of AFC and also contends that the undisputed material facts show that it is entitled to summary judgment on the claim of conspiracy, as well as the claim against CIBC as principal of Belatti. CIBC also argues that plaintiffs have no standing to bring a claim against it under the LUTPA.

In opposition, plaintiffs contend that numerous genuine issues of material fact exist which preclude the entry of summary judgment. Plaintiffs also submit, in the form of a general argument, that AFC's claim for accounting has no basis in law or fact.

### Standard For Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure requires the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

1. In their most recent supplemental and amended complaint, plaintiffs named as defendants Frank Belatti and Belatti Consulting Group, Ltd., but the late Judge Okla Jones II, the judge to whom this case was formerly allotted, dismissed these defendants for lack of personal jurisdiction.

Recently, defendant AFC filed a separate action against plaintiffs, C.A. No. 95–3833, which was consolidated with plaintiffs' lawsuit. However, the issues in the consolidated case are not discussed.

material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement is that "there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). A fact is "material" if proof of its existence or non-existence would affect the outcome of the lawsuit under the law applicable to the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Id.* at 257, 106 S.Ct. at 2514–15.

Once the party moving for summary judgment has satisfied its burden by showing that there is an absence of evidence to support the non-moving party's case, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories, etc., in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Failure of the non-moving party to meet this burden mandates the entry of summary judgment in favor of the movant. *Id.*

*Analysis*

*A. Express Breach Of Contract*

██ Louisiana law provides that "where the words of a contract are clear and explicit and lead to no absurd consequences, the contract's meaning and the intent of the parties must be sought within the four corners of the document." *American Totalisator Company, Inc. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir.1993), *citing* LSA–R.S. C.C. 2046.[2] If a contract is unambiguous

concerning the intent of the parties, a court may enter judgment as a matter of law. *Id.*

Plaintiffs claim that AFC breached the express provisions of the franchise agreements through AFC's operation of Church's restaurants and its marketing policies.[3] Both franchise agreements at issue provide:

E. Franchisee understands and agrees that its license under said Proprietary Marks is non-exclusive to the extent that Franchisor has and retains the rights under this Franchise Agreement:

\* \* \* \* \* \*

2. To develop and establish other franchise systems for the same, similar, or different products or services utilizing Proprietary Marks not now or hereafter designated as part of the system licensed by this Franchise Agreement, and to grant licenses thereto, without providing Franchisee any right therein.... [4]

This language is clear and unambiguous in allowing AFC as franchisor to operate another franchise system in the Detroit area where plaintiffs' Popeyes restaurants are located. *See Biscuit Investments, Inc. v. Cajun Enterprises*, 1991 WL 42584 (E.D.La. March 27, 1991).

Plaintiffs submit that the foregoing contractual language is ambiguous and does not allow the operation of a separate franchise system. Plaintiffs contend that the language merely reserves to AFC the option to retain the right to "develop and establish" other franchise systems and that because AFC did not reserve that right through any other provision of the franchise agreements, AFC cannot rely on the quoted terms. I reject this position as a crabbed, convoluted reading

---

2. Article 2046 of the Civil Code provides: "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Louisiana law is applicable according to the terms of the franchise agreements at issue.

3. Summary judgment was previously granted on plaintiffs' claims that preceded the confirmation of AFC's reorganization plan. To the extent plaintiffs' claims merely allege a continuation of the policies of AFC's bankrupt predecessor, these claims are barred due to plaintiffs' failure to

assert them in the bankruptcy. "Order and Reasons," R.Doc. 263. The Bankruptcy Court's Order of Confirmation clearly vested AFC with all property of the bankrupt estate free and clear of any claims. Nevertheless, as hereinafter discussed, plaintiffs' claims against AFC also fail on the merits.

4. Franchise Agreements, §§ V.E.2., Exhs. 1 and 2 attached to AFC's motion for summary judgment.

of the franchise agreement in conflict with Louisiana law on contract interpretation.

Nor does AFC's operation of another franchise in Detroit violate any territorial restriction in the franchise agreements. Plaintiffs believe that the portion of the franchise agreement immediately prior to the portion quoted above, which provides that the franchisor retains the right to grant licenses "outside of Franchisee's exclusive territory," undercuts what they describe as AFC's "crimped" reading of the franchise agreement. However, plaintiffs' construction of the contract terms provides the "crimped" reading; the franchisor's reservation of rights to grant licenses for Popeyes restaurants outside plaintiffs' exclusive territory is far different from the plain meaning of the reservation of rights to "develop and establish other franchise systems" without any territorial restriction.

■ Plaintiffs' argument that the stores in Detroit are company stores as opposed to franchise stores does not create a genuine issue of material fact. At the time ACE's predecessor was courting Church's for takeover, only slightly more than one-third of Church's 1,087 stores were franchised. The rest were company-owned. However, plaintiffs have failed to cite any law holding that this ratio of franchise stores to company-owned stores means that Church's is not a "franchise system." Indeed, company ownership of stores in a franchise system is common. *See, e.g., Canterbury v. Commissioner of Internal Revenue*, 99 T.C. 223, 238, 1992 WL 195963 (1992) (discussing McDonald's ownership and management of 1,470 of 6,620 stores).

In short, there is no genuine issue of material fact. AFC did not breach the express language of the franchise agreements by developing and establishing Church's franchises in the Detroit market. It follows that the establishment of the "dual marketing strategy," assuming it exists,[5] does not breach the express terms of the franchise agreement.

As for plaintiffs' assertion that AFC's marketing policies favor Church's over Popeyes, the unrebutted affidavits submitted by AFC and CIBC firmly establish that, although AFC is one entity, Church's and Popeyes maintain distinct marketing policies to which the other is not privy.[6] Additionally, the plain language of the franchise agreements establishes that advertising is not meant to benefit the franchisees directly. One agreement provides that choice of media and locale for advertising placement shall be at the sole discretion of the administrator of an advertising fund to which franchisees contribute. Further, this agreement states:

> Franchisee understands that such advertising is intended to maximize the public's awareness of POPEYES Famous Fried Chicken Restaurants, and that Franchisor accordingly undertakes no obligation to insure that any individual franchisee benefits directly or on a pro rata basis from the placement, if any, of such advertising in his market.[7]

The other franchise agreement at issue provides substantially the same terms.[8] According to this unambiguous language, advertising performed by AFC for Popeyes need not benefit plaintiffs. Thus, summary judgment is appropriate on this portion of the express breach of contract claim.

### B. Breach Of Implied Obligation Of Good-Faith Performance

■ "Into all contracts ... good faith performance is implied." *National Safe Corporation v. Benedict and Myrick, Inc.*, 371 So.2d 792, 795 (La.1979). Since, AFC did not breach the terms of the franchise agreements but acted within its limits in acquiring and operating the Church's franchise system, plaintiffs' argument that AFC breached the implied obligation of good faith fails because

---

5. As discussed hereafter, this proposition has no basis in fact according to AFC's uncontroverted affidavits.

6. *See* affidavits of Joseph B. Scafido and Hada Moddelmog submitted by AFC and affidavit of R. Bruce Layman submitted by CIBC in support of their respective motions for summary judgment.

7. Franchise Agreement, § III.B., Exh. 1 attached to AFC's motion for summary judgment.

8. Franchise Agreement, § III.B.7., Exh. 2 attached to AFC's motion for summary judgment.

"[t]he implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 485 (5th Cir.1984).

Even had I held that the franchise agreements did not allow AFC to operate Church's franchises in the same locale as plaintiffs' restaurants, I would have found that plaintiffs' claim for breach of good faith falls woefully short because there has been no showing by plaintiffs of intent or ill will necessary to prove this claim. *See Brill v. Catfish Shaks of America, Inc.*, 727 F.Supp. 1035, 1041 (E.D.La.1989). Moreover, "good faith" is no longer measured by application of the Golden Rule "not to do unto others that which we would not wish others should do unto us," as set forth in *Benedict*, but by analyzing whether one party has taken unfair advantage of another and unjustly enriched itself at the other's expense. *American Bank & Trust of Coushatta v. F.D.I.C.*, 49 F.3d 1064, 1067 (5th Cir.1995). *See* LSA–C.C.Art. 2055 ("Equity ... is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another"). Plaintiffs have presented no evidence to show either of these essential elements, *i.e.*, that AFC has taken unfair advantage of plaintiffs or that it acted with the intent to unjustly enrich themselves. Because plaintiffs have failed to make a sufficient showing on an essential element of their case on which they bear the burden of proof at trial, summary judgment is proper. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552–53.

Plaintiffs' reliance on *Scheck v. Burger King Corp.*, 756 F.Supp. 543 (S.D.Fla.1991) is misplaced for two reasons. First and foremost, *Scheck* construed Florida law on the implied covenant of good faith and fair dealing inherent in any contract, *id.* at 548–49,

and Florida law appears different from Louisiana law, which is applicable here.[9] Second, since *Scheck*, another district court in the Southern District of Florida has ruled that a claim based on an "implied covenant of good faith and fair dealing cannot stand apart from a claim for breach of the contract's express terms." *Burger King v. Holder*, 844 F.Supp. 1528, 1530 (S.D.Fla.1993). *Cf. Domed Stadium Hotel, supra.* For these reasons, *Scheck* is inapposite.

*C. Detrimental Reliance/Promissory Estoppel*

Plaintiffs seek recovery under Louisiana Civil Code Article 1967 for an alleged promise of defendants AFC and CIBC made through Frank Belatti.[10]

Article 1967 provides in pertinent part:

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.

LSA–C.C.Art. 1967. In order to recover on a claim of detrimental reliance, plaintiffs must prove: "(1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance." *Breaux v. Schlumberger Offshore Services, A Division of Schlumberger Ltd.*, 817 F.2d 1226, 1230 (5th Cir.1987). Plaintiffs' claim must be analyzed in the factual context from which it arose, *i.e.*, a conversation between plaintiff Burney and Belatti in the summer of 1992 when Belatti, as a consultant for CIBC, sought plaintiffs' help in gaining support from other franchisees for CIBC's plan of reorganization in bankruptcy court. According to Burney's deposition testimony, he told Belatti that he would solicit the support of other franchisees "[b]ut I told him I wasn't going to do it for nothing." As a quid pro quo, Burney re-

9. There are no facts in the record that would make Florida law even remotely applicable.

10. In a supplemental memorandum in opposition plaintiffs state, confusingly, that they do not "urge" the Court to apply any particular state's law on this claim against CIBC but at the same time "suggest" that Georgia law is applicable as

to CIBC. However, in their original memorandum in opposition adopted *in toto* by plaintiffs' present counsel, plaintiffs clearly relied on Louisiana law in support of their arguments. Although I apply Louisiana law, the result is no different under Georgia law. *See* n. 13, *infra*.

quested that the Church's system be separated from the Popeyes system and/or that an "immediate" market be provided for the sale of plaintiffs' three stores located near Church's restaurants. In response, Belatti said: "... but you know I can't do anything ... right now."

The request for a market for plaintiffs' stores is clarified and amplified by Burney's affidavit attached to plaintiffs' supplemental memorandum in opposition.[11] There, Burney states:

> We explained that we were ... having trouble selling off any of our stores, at any price, because of the uncertainty of the ACE bankruptcy proceedings. Banks just would not loan monies to a bankrupt concept period even if the borrowers were creditable.
>
> We explained that we needed CIBC to provide us with an immediate market for three of our stores and we thought that they could literally 'kill two birds' with one stone if CIBC or the new owner could buy the three stores of ours that were competing directly across the street from the company owned [sic] Churchs [sic] stores since this is where ACE was inflicting most of the damages upon us.
>
> We further explained that if CIBC or the new owner would invest their money in our Detroit market, particularly, in the Popeyes concept that we felt that we would have less to fear from them as our franchisor.
>
> We further explained that we, along with many other Popeyes franchisees, ultimately wanted the two concepts split entirely and that the other Popeyes franchisees that Mr. Belatti wanted me to poll would want to hear it from me that CIBC through Mr. Belatti was eventually going to do just that before they would support him. We concluded that it would be under these conditions that I would be willing to participate and contact as many Popeyes franchisees as I physically could within the

next three business days ... that was left since the next bankruptcy hearing was scheduled for Thursday, August 6, 1992.

Mr. Belatti, after hearing of our conditions to gain our support and cooperation with the poll that he and CIBC needed of the requisite franchisees, stood up, extending his hand to me, and said "... but you know I can't do anything ..... [sic] right now." (indicating his general acceptance of our terms and also indicating that if the CIBC plan was successful he would later on have the power to fulfill our conditions)....[12]

Plaintiffs' claim with regard to splitting the two concepts of Popeyes and Church's falls of its own weight. The uncontroverted affidavits submitted in support of the motions for summary judgment by both AFC and CIBC show that Popeyes and Church's are split. Their marketing and advertising are distinct, and neither has knowledge of such practices of the other. The affidavit of the CIBC representative on AFC's board, R. Bruce Layman, substantiates the separation of Popeyes and Church's, affirming that the AFC board is not involved in the marketing or advertising campaigns of either Popeyes or Church's. Thus, even assuming that Belatti's statement constitutes a representation reasonably relied upon by plaintiffs to their detriment, the undisputed facts show that the representation has been fulfilled.

Turning to the plaintiffs' request for a market for their stores, it is important to note exactly what plaintiffs sought, according to Burney's affidavit clarifying his deposition testimony: "an immediate market" for three of their stores. I find that Belatti's alleged statement of "I can't do anything ... right now"—in response to plaintiffs' request for immediate action—does not constitute a representation by conduct or word on the part of Belatti for AFC or CIBC to perform any act in the future. Plaintiffs' request was not for something in the future but for a market

---

**11.** The date of the affidavit is October 27, 1995, postdating Burney's deposition testimony. I find this affidavit to be a supplementation and clarification of Burney's deposition testimony because the affidavit discusses the conversation at issue in much more detail than the deposition.

**12.** Affidavit of Roger R. Burney, Exh. 2 attached to plaintiffs' supplemental memorandum in opposition to CIBC's motion.

there and then. Clearly, Belatti could take no action in July of 1992 while ACE was still in bankruptcy. Hence, because plaintiffs cannot prove the first element necessary to sustain a claim of detrimental reliance, defendants are entitled to summary judgment on this claim. *See Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Moreover, in the context of the conversation between Burney and Belatti, plaintiffs could not have justifiably relied on Belatti's statement because, again, the time frame was limited to the period during the bankruptcy, not any future time.[13]

*D. Unfair Trade Practices*

■ Louisiana law proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." LSA–R.S. 51:1405 ("LUTPA"). Any "person," including natural person, partnership or corporation, who suffers loss as a result of an unfair or deceptive trade practice can maintain a cause of action under LUTPA. LSA–R.S. 51:1402(9) and 1409(A). However, LUTPA provides a cause of action only to "consumers and business competitors." *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 975 F.2d 1192, 1205 (5th Cir. 1992). Respecting the elements necessary to prove a violation of LUTPA,

> Louisiana has left the determination of what is an "unfair trade practice" largely to the courts to decide on a case-by-case basis. Cases decided under the statute have defined the range of prohibited practices quite narrowly. An "unfair trade practice" is "a practice that is unethical, oppressive, unscrupulous or substantially injurious." Fraud, misrepresentation, deception and similar conduct is prohibited; mere negligence is not.

*Turner v. Purina Mills, Inc.,* 989 F.2d 1419, 1422 (5th Cir.1993) (citations omitted). The statute does not prohibit "sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions." *Id.* "Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious." *Id.* Moreover, LUTPA does not provide an alternative cause of action for breach of contract. *Id.*

Plaintiffs have failed to allege that they compete with CIBC or consume any of CIBC's products or services. Moreover, although CIBC has exercised its right to elect members to AFC's board of directors, it has never elected a majority of the board. This is according to the uncontroverted affidavit of R. Bruce Layman, CIBC Managing Director who has served as an AFC director since November 5, 1992. Mr. Layman's affidavit also indicates that CIBC has never controlled his activities as a board member and that CIBC has never attempted to influence AFC on marketing matters. Indeed, according to Layman's affidavit, the AFC board is not involved in the marketing and advertising campaigns of Popeyes or Church's and does not approve these matters or matters related to menu selection. Since plaintiffs neither compete with CIBC nor consume its products or services, they cannot maintain a claim under LUTPA.

There also can be no finding of unfair trade practices on the part of either AFC or CIBC. Absent franchise termination, "courts have not imposed general fiduciary obligations on franchisors" which would establish the special trust relationship recognized by the Fifth Circuit to be at the core of LUTPA. *Domed Stadium Hotel,* 732 F.2d at 485. Therefore, the special relationship deemed important in finding a violation of LUTPA is absent here.

In addition, plaintiffs have failed to establish that defendants performed any "unethical, oppressive, unscrupulous or substantially injurious" acts. AFC and, even assuming it

---

13. CIBC is entitled to summary judgment even if Georgia law were applicable. Georgia law provides that "a promise which the promisor would reasonably expect to induce action or forbearance on the part of the promisee ... is binding...." OCGA § 13–3–44. *See Restatement 2d of Contracts,* § 90. The threshold requirement is that there be a promise, which "may be defined as a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Foley Company v. Warren Engineering, Inc.,* 804 F.Supp 1540, 1544–45 (N.D.Ga.1992), citing *Restatement 2d of Contracts,* § 2. As a matter of law, Belatti's statement that "I can't do anything ... right now" is not a manifestation of intent to act in the future.

was involved, CIBC were well within the terms of the franchise agreements to "develop and establish" the Church's franchise system. These acts constitute "sound business practices ... or appropriate free enterprise transactions." *Turner*, 989 F.2d at 1422, *quoting Monroe Medical Clinic, Inc. v. Hospital Corp. of America*, 522 So.2d 1362, 1365 (La.App.2d Cir.1988).

The affidavits submitted by AFC and CIBC indicating that the marketing and advertising decisions of the Popeyes and Church's divisions of AFC are separate and distinct, without either division being privy to the other's policies and plans stand unrebutted. Plaintiffs argue that evidence of the "dual brand strategy" of placing Church's at the low end of the fast-food fried chicken market and Popeyes at the high end constitutes a genuine issue of material fact. This argument also fails. Belatti's unrebutted deposition testimony is that the prices of Church's and Popeyes' fried chicken are "fairly comparable," and that the distinction between "low market" and "high market" referred more to Church's as a value brand and Popeyes' as a "flavor quality" brand, and that pricing is really set by the individual franchisees.

Further, this last statement is supported by the uncontroverted affidavit of William M. White Jr., AFC's field marketing manager for Popeyes franchises, which confirms that plaintiffs have discretion to set their own prices. This affidavit also provides that plaintiffs relied primarily on coupons for their marketing and that plaintiffs on four separate occasions have taken advantage of price flexibility offered to franchisees for special coupon offers, even charging prices higher than the suggested prices on certain of these occasions.

The allegation in plaintiff Clark's affidavit that AFC offers only one pre-determined "main offer" with an alternative and that plaintiffs' decision not to choose either of these offers means that they would not receive any advertising for that period, other than what plaintiffs might generate at their own cost, does not create a genuine issue of material fact. The franchise agreements simply do not guarantee that advertising will benefit any specific franchisee.

Neither do Clark's statements in his affidavit that plaintiffs were not allowed to use the phrase "all dark meat" in their main offer nor were they allowed to change a "9 piece bundle to a 10 piece bundle" because their cash registers were programmed for 8, 10, and 12 pieces, create a genuine issue of material fact. The fact that plaintiffs programmed their cash registers in a particular manner is plaintiffs' doing. The denial of plaintiff's request to add a phrase to the advertising is reasonably in line with the franchise agreements' specified use of the advertising, *i.e.*, to "maximize the public awareness" of Popeyes and its franchised units with no obligation that any individual benefit directly or on a *pro rata* basis from advertising in a local market.

Because plaintiffs have no basis to bring an action against CIBC under LUTPA and since there is no genuine issue of material fact supporting plaintiffs' claim that AFC and CIBC engaged in "unfair trade practices" under LUTPA, summary judgment is proper on this claim.[14]

## E.  Tortious Interference With Business Relationship And Contract

Plaintiffs allege that AFC improperly prevented plaintiffs from selling two of their Popeyes' restaurants to another individual, Walter Haskett. Plaintiffs also allege that CIBC tortiously interfered with their contracts and business relationship with AFC. These claims are addressed *seriatim.*

To prevail on the claim against AFC plaintiffs "must show by a preponderance of the evidence that the defendant improperly influenced others not to deal with plaintiff." *McCoin v. McGehee*, 498 So.2d 272, 274 (La. App. 1st Cir.1986). *See Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 5 (5th Cir.1992) (quoting *McCoin* ). One of the requirements in the franchise agreement for transfer of a

---

14.  In view of this decision, it is unnecessary to decide whether plaintiffs' claims are preempted under LUTPA.

franchise is that the transferee meet the franchisor's criteria for a new franchisee. Indeed, the purchase agreement between plaintiff FMU and Haskett recognized that the assignment of the franchises would have to be satisfactory to AFC. It is undisputed that Haskett never submitted formal application to AFC. Thus, AFC had a valid contractual reason for refusing to approve the transfer from FMU to Haskett and, therefore, is entitled to summary judgment on this claim.

Plaintiffs contend that AFC refused to approve the transfers due to a provision in the franchise agreement requiring a general release, which has been declared invalid under Michigan law. Notwithstanding the invalidity of a general release requirement, defendants have set forth a valid, distinct reason for refusal to approve the transfers to Haskett. Thus, summary judgment is appropriate.[15]

Regarding the tortious interference claim asserted against CIBC, the Louisiana Supreme Court in *9 To 5 Fashions, Inc. v. Spurney*, 538 So.2d 228, 234 (La.1989), established that one of the elements necessary to prove "intentional and unjustified interference with contractual relations" is a corporate officer's "intentional inducement or causation of the corporation to breach the contract" in question. Here, the contracts in question are the franchise agreements, but as I have found, there has been no breach of the contract by AFC. Thus, without this required element, plaintiffs' claim against CIBC falls of its own weight.

## F. Abuse Of Rights

Plaintiffs contend that the conduct of both AFC and CIBC constituted an abuse of rights under the franchise agreements. This civil law doctrine refers to the abuse of contractual rights, *Illinois Cent. Gulf Railroad Co. v. International Harvester Co.*, 368 So.2d 1009, 1014 (La.1979), but is "applied only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights." *Truschinger v. Pak*, 513 So.2d 1151, 1154 (La.1987). The doctrine is applied only in four situations:

(1) "if the predominant motive for it was to cause harm";

(2) absent proof of an intent to harm, "if there was no serious or legitimate interest in the exercise of the right worthy of judicial protection";

(3) if "the exercise of the right is against moral rules, good faith, or elementary fairness"; or,

(4) "[i]f the holder of the right exercised the right for a purpose other than that for which the right was granted."

*Illinois Cent. Gulf Railroad*, 368 So.2d at 1014. Both AFC and CIBC contend that the undisputed facts show that none of these circumstances exist. I agree.

Plaintiffs argue that defendants' control of advertising and menu selections for Popeyes and Church's, which caused Church's to be more attractive to the low-end of the market, coupled with the Church's "inequitable couponing campaign," which plaintiffs allege is timed to benefit Church's at the expense of Popeyes' restaurants, constitute genuine issues of material fact which show an abuse of rights. However, the undisputed facts show that there was no attempt by AFC or CIBC to pigeonhole Popeyes' into the upper-price of the market and Church's into the lower-price. Belatti's uncontroverted testimony is that the prices are "fairly comparable" and that the difference between Church's and Popeyes is big pieces/value versus quality/flavor. Moreover, the uncontroverted facts show that the Church's and Popeyes' marketing systems operate independently of each other so there can be no abuse of rights.

Finally, plaintiffs' contention that the general release requirement constitutes an abuse of rights also fails for the reasons previously discussed. Simply put, AFC had an independent reason to deny the transfer of the franchises, *i.e.*, Haskett failed to meet the criteria necessary for a new franchisee. Plaintiffs have offered no evidence to support any of the circumstances under which the abuse of

---

**15.** The undisputed facts show that FMU "sold" all its assets in May of 1992—prior to the purchase agreement with Haskett—to plaintiff Seven Mile Catering. Thus, it is doubtful that FMU even owned any assets which it could transfer to Haskett.

rights doctrine may be applied. Accordingly, summary judgment on this count is granted. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53.

### G. Conspiracy Of CIBC

■ Plaintiffs allege conspiracy by CIBC with AFC, and its predecessors, in its knowledge and approval of the "dual marketing strategy" and its participation in the management of AFC. However, Louisiana has not created a civil action for conspiracy in and of itself. *Junior Money Bags, Ltd. v. Segal,* 798 F.Supp. 375, 379 (E.D.La.1990), *aff'd,* 970 F.2d 1 (5th Cir.1992). "The cause of action is not the conspiracy itself but rather the tort the alleged conspirators agreed to perpetrate and which they actually committed in whole or in part." *Id.* at 379–80. Because I have found no underlying tort to support a civil action for conspiracy, CIBC is entitled to summary judgment on this claim.

Moreover, there is no evidence of the agreement necessary for a conspiracy. "[T]o recover, a plaintiff must be able to prove that an agreement existed between the accused defendants to commit the illegal or tortious act which resulted in plaintiff's injury." *Kiva Const. and Engineering, Inc. v. International Fidelity Ins. Co.,* 749 F.Supp. 753, 756 (W.D.La.1990), *citing Thomas v. City of New Orleans,* 687 F.2d 80, 83 (5th Cir.1982).

The time periods for the alleged conspiracy are easily divided into the periods before and after confirmation of the bankruptcy reorganization plan in November of 1992. Plaintiffs maintain that CIBC knew of the business plan that resulted in the "dual marketing strategy" prior to its initial loan to ACE's predecessor and then participated in the employment of this strategy following the emergence of AFC from the bankruptcy. This argument fails for a number of reasons.

The content of the business plan undercuts plaintiffs' argument because it calls for virtual elimination of Church's restaurants from the Detroit area, either through conversion to Popeyes or closure. Additionally, according to the uncontroverted affidavit of CIBC's vice president, Heinz Noeding, not only was CIBC *not* involved in the creation of the business plan but also the plan called for the reduction of discounting at Church's franchises, which would result in higher, not lower, prices for Church's products.

Plaintiffs' argument also fails because they have not presented any evidence to show that CIBC controlled AFC's predecessors to the extent that the predecessors were a mere instrumentality of CIBC. Thus, CIBC cannot be liable for the actions of AFC's predecessors. *Cf. Krivo Indus. Supply Co. v. National Distillers & Chemical Corp.,* 483 F.2d 1098, 1102, 1114 (5th Cir.1973) (under Alabama law, although company's position as major creditor "vested it with the capacity to exert great pressure and influence," such relationship is not enough to constitute control); *U.S. v. Clinical Leasing Service, Inc.,* 982 F.2d 900, 903 (5th Cir.1992) (setting forth elements necessary to prove alter ego doctrine under Louisiana law and recognizing applicability of *Krivo* in instructing jury as to domination of subsidiary corporation by parent corporation, which in *Krivo* was also a major creditor).

Plaintiffs also point to the loan syndication memorandum produced by CIBC as evidence of the conspiracy between CIBC and AFC's predecessors to establish the "dual marketing strategy." This contention fails because the document itself disclaims any verification of information by CIBC or participation by CIBC in business projections, specifically reserving those judgments to AFC's predecessor. Plaintiffs' theory of the "dual marketing strategy" is belied by Belatti's explanation of the meaning of the "low end" and "high end" of the market and also by the undisputed fact that the marketing plans of Popeyes and Church's are separate and distinct.

Plaintiffs' reliance on the proxy statement issued in connection with the Church's takeover is also misplaced. Although the acknowledgement in the proxy statement that Church's and Popeyes are competitors in some markets is true, this does not violate the franchise agreements. Thus, the proxy statement is not indicative of an agreement between CIBC and AFC's predecessors necessary to establish a conspiracy.

Turning to the post-bankruptcy era of AFC, plaintiffs' arguments are easily dismissed for they are based upon assertions

that CIBC has controlled AFC. However, the undisputed facts show that AFC acts independently, that CIBC's ability to elect members of AFC's board of directors does not translate to control of AFC, and that the day-to-day marketing decisions for Popeyes and Church's are made by independently and not by the AFC board.

In short, summary judgment is appropriate on plaintiffs' allegations of conspiracy against CIBC because plaintiffs have failed to raise a genuine issue of material fact indicative of an agreement between CIBC and AFC's predecessors or AFC itself.

## H. Liability Of CIBC As Principal

■ The second of plaintiffs' independent claims against CIBC is liability as a principal for Belatti's alleged promise to purchase plaintiffs stores or separate the Popeyes and Church's chains. The parties spend much time debating whether Belatti was CIBC's agent. However, it is unnecessary to decide this issue because Belatti's statement did not constitute an enforceable promise.

Even assuming Belatti's statement that "I can't do anything ... right now" can be construed as a promise to do something for plaintiffs in the future, an assumption with which I disagree, the parties "must agree to some ascertainable method to arrive at that price in order to have a binding contract of sale under Louisiana law." *Conkling v. Turner,* 18 F.3d 1285, 1301 (5th Cir.1994). The record is devoid of a meeting of the minds between Belatti and plaintiffs as to the method for determining a price for these stores. Indeed, a letter written by plaintiff Burney to Belatti in November of 1992, which is relied on by plaintiffs in support of their agency argument, indicates that no agreement was reached. In that letter, Burney writes that in a meeting with several Belatti

Consulting Group employees, they "explored a number of alternatives such as outright buyout of the affected stores, sale and lease-back arrangements, [and] refurbishing the other stores still left in my market...." Clearly there was no contract of sale under Louisiana law.[16] Hence, CIBC is not liable as a principal of Belatti for his alleged promises.

## I. AFC's Counterclaim

■ AFC counterclaimed against FMU for an accounting related to its ownership of preferred stock in FMU. In 1986, in compromise of a lawsuit filed in this Court between franchisees, including FMU, and AFC's predecessors, AFC's predecessors agreed to accept $600,000 in par value of franchisees' nonvoting preferred stock in full satisfaction of FMU's obligations to the franchisor. The settlement agreement provided that each year an amount "equal to 50% of the audited after tax profits of Franchisee ... shall be allocated among all holders of the preferred stock on a share for share basis...." The uncontroverted affidavit of Jane B. Long, AFC's Corporate Counsel, states that she has reviewed AFC's records to determine whether AFC, as successor to the parties who entered into the foregoing settlement agreement, received any payment from FMU. Long determined that "AFC has received no such payment, and that AFC has not received audited financial statements of FMU, as contemplated by the terms of the Preferred Stock."

■ Louisiana law recognizes a claim for an accounting for corporate dividends. *See Directional Wireline Services, Inc. v. Tillett,* 552 So.2d 1201, 1215 (La.App. 1st Cir.1989), *writs denied,* 551 Do.2d 1343, 1344 (1989). Plaintiffs offer no specific factual or legal opposition to AFC's motion for summary judgment on the counterclaim, merely stat-

16. The result is no different under Georgia law. Georgia law provides "that even though terms are left open, a contract for sale does not fail for indefiniteness 'if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.'" *Drug Line, Inc. v. Sero–Immuno Diagnostics, Inc.,* 217 Ga.App. 530, 458 S.E.2d 170, 171 (1995). However, OCGA § 11–2–204 does not "obliterate the common law rule that the first requirement of

law of a valid contract is that there be a meeting of the minds of the parties and mutuality, and the agreement must be expressed plainly and explicitly enough to show what the parties agree upon...." *Id.* There can be no enforcement if the terms of a contract are "incomplete or incomprehensible" or if the "agreement is entirely subject to conjecture." *Id.* That is precisely the situation here.

598

ing in a footnote that there is no basis in law or fact for AFC's claim. The record proves otherwise, and because plaintiffs have failed to show a genuine issue of material fact on the counterclaim, AFC's motion is granted.

*Conclusion*

Plaintiffs' allegations that arise from the alleged breach and/or abuse of the franchise agreements by AFC, its predecessors, and CIBC in the operation of the Church's franchise system simultaneously with the Popeyes system fail to survive summary judgment. Pursuant to the law by which each claim is judged, there are no genuine issues of material fact, thereby entitling defendants to judgment as a matter of law.

Accordingly,

IT IS ORDERED that defendants' motions for summary judgment are GRANTED.